IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-cv-25065-KMW

**Lady Moon LLC,**
Defendant,

**v.**

**Oscar Herrera,**
Plaintiff.

> FILED BY _MC_ D.C.
>
> JAN 30 2025
>
> ANGELA E. NOBLE
> CLERK U.S. DIST. CT.
> S. D. OF FLA. - MIAMI

## DEFENDANT'S ANSWER TO THE COMPLAINT

I, Carisla Ozoria, representing myself as the owner/operator of Lady Moon LLC, hereby file this Answer to the Complaint filed by the Plaintiff, and in support thereof state as follows:

## I. GENERAL DENIAL

I deny each and every allegation set forth in Plaintiff's Complaint, except those expressly admitted herein.

## II. SPECIFIC RESPONSES

1. I admit that Lady Moon LLC operates as a franchise under a larger brand, but deny that it owns, operates, or maintains the website referenced in the Complaint.
2. I deny any liability for alleged violations of the Americans with Disabilities Act (ADA) as Lady Moon LLC does not control or manage the website at issue.
3. I assert that responsibility for the website in question does not lie with Lady Moon LLC, which has no authority over the design, content, or compliance of the website.
4. I deny that Lady Moon LLC has any legal duty to modify or maintain the website and assert that any claims regarding accessibility should be directed to the appropriate responsible entity.

## III. AFFIRMATIVE DEFENSES

**First Defense: Lack of Standing**
Plaintiff lacks standing to bring this lawsuit against Lady Moon LLC, as it does not own, operate, or control the website in question.

**Second Defense: Failure to State a Claim**
Plaintiff fails to state a claim upon which relief can be granted against Lady Moon LLC, as the obligations under the ADA, if any, lie with the entity responsible for the website's operation.

**Third Defense: No Control Over the Website**
Lady Moon LLC, as a franchisee, does not have control over the design, functionality, or content of the website and, therefore, cannot be held liable for any alleged non-compliance.

**Fourth Defense: Improper Defendant**

Plaintiff has named the incorrect party as Defendant in this matter. The proper entity responsible for maintaining and controlling the website is not Lady Moon LLC.

## IV. SUPPORTING DOCUMENTATION

Attached to this filing are supporting documents that demonstrate Lady Moon LLC operates as a franchise and does not have ownership or control over the website, including but not limited to:

- A copy of the franchise agreement or relevant documentation.
- Communications indicating that website management is outside the control Business
- Articles of Organization Lady Moon
- 

WHEREFORE, I respectfully request that this Honorable Court dismiss the Complaint against Lady Moon LLC with prejudice and grant any further relief deemed just and proper.

Respectfully submitted,

Carista Ozoria

Lady Moon LLC

3015 Grand Ave, Coconut Grove, FL 33133

786-491-9491

cocowalk@studio3dbrows.com

Representing Myself

(version – Oct 30, 2019)

**EXHIBIT A**

**FRANCHISE AGREEMENT**

**STUDIO 3D BROWS' LASHES & PMU ™**

**FRANCHISE AGREEMENT**

**BETWEEN**

**3D BROWS FRANCHISING GROUP LLC**
**2980 NE 207ST STREET, UNIT 116**
**AVENTURA, FL**
**(786) 384-1710**

**FRANCHISOR**
**(Represented by Mariela Ventura)**

AND

_____ LADY MOON, LLC _____

**FRANCHISEE**
**(Represented by Carisla M Ozoria)**

| |
|---|
| Street |

| City | State | Zip Code |
|---|---|---|

( _____ ) _____
Area Code                                    Telephone

**FRANCHISED LOCATION:**

_____ CocoWalk Shopping Center _____
                              Street
_____ Coconut Grove _____ FL _____
City                              State                    Zip Code
( _____ ) _____
Area Code                                    Telephone

**DATE OF FRANCHISE AGREEMENT:**

_____ **Aug 15, 2020** _____

# STUDIO 3D BROWS' LASHES & PMU ™

## FRANCHISE AGREEMENT

### INDEX

| ARTICLE | TITLE | PAGE |
|---|---|---|
| 1 | FRANCHISED LOCATION; GRANT OF FRANCHISE | 5 |
| 2 | TERM; FRANCHISEE'S OPTION TO REACQUIRE FRANCHISE | 6 |
| 3 | 3D BFG's RIGHT TO LICENSE MARKS | 7 |
| 4 | INITIAL FEE; APPROVAL OF FRANCHISSE | 8 |
| 5 | CONTINUING FEES | 9 |
| 6 | ADVERTISING | 10 |
| 7 | QUALITY CONTROL, UNIFORMITY AND STANDARS REQUIRED OF THE FRANCHISEE | 11 |
| 8 | CONFIDENTIAL OPERATIONS MANUAL AND OTHER INFORMATION | 17 |
| 9 | 3D BFG TERMINATION RIGHTS | 18 |
| 10 | FRANCHISEE'S TERMINATION RIGHTS | 20 |
| 11 | FRANCHISEE'S OBLIGATIONS UPON TERMINATION OR EXPIRATION | 22 |
| 12 | FRANCHISEE'S COVENANTS NOT TO COMPETE | 23 |
| 13 | 3D BFG's RIGHT OF FIRST REFUSAL TO PURCHASE | 25 |
| 14 | ORIENTATION TRAINING PROGRAM; INITAIL TRAINING; OPENING ASSISTANCE | 27 |
| 15 | 3D BFG's OTHER OBLIGATIONS | 28 |
| 16 | STUDIO 3D BROWS' LASHES & PMU SIGN | 29 |
| 17 | INSURANCE | 30 |
| 18 | INDEPENDENT CONTRACTORS; INDEMNIFICATION | 31 |
| 19 | FINANCIAL STAMENTS; GROSS REVENUE REPORTS; FORMS AND ACCOUNTING | 32 |
| 20 | ASSIGNMENT | 34 |
| 21 | SITE SELECTION; STANDARD STORE LAYOUTS AND PLANS | 36 |
| 22 | LEASE AS SECURITY; TERMINATION OF LEASE | 37 |
| 23 | ARBITRATION | 38 |
| 24 | ENFORCEMENT | 41 |
| 25 | NOTICE AND EMAIL | 43 |
| 26 | ACKNOWLEDGMENTS | 44 |
| 27 | DISCLAIMER; FRANCHISEE'S LEGAL COUNSEL | 45 |
| 28 | GOVERNING LAW; STATE MODIFICATIONS | 45 |
| 29 | DEFINITIONS | 46 |

PERSONAL GUARANTY                                                          48

EXHIBITS:

| | | |
|---|---|---|
| 1. | CONFIDENTIALITY AGREEMENT | 49 |
| 2. | AUTHORIZATION FOR DIRECT PAYMENT | 50 |
| 3. | MINIMUM STAFF | 51 |
| 4. | SITE LOCATION & SELECTED TERMS | 52 |
| 5. | DIGITAL MARKETING ADDENDUM | 53 |

3

## STUDIO 3D BROWS' LASHES & PMU ™

### FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT (this "Agreement") made, entered into and effective this 15 day of August, 2020, ("Effective Date") by and between 3D BROWS FRANCHISING GROUP, LLC, a Florida Limited Liability Cny ( hereinafter " FRANCHISOR", "3D BFG" or "3D Brows"), and LADY MOON, LLC (the "FRANCHISEE");

WITNESSETH:

WHEREAS, 3D BFG has developed and owns a distinctive business system for operating a brows, lashes and make-up businesses of a distinctive character with the name **"Studio 3D Brows Lashes & PMU ™" (the "Business System", the "3D Brows Business System")** and has publicized the name **"Studio 3D Brows Lashes & PMU ™"**, and other trademarks, trade names, service marks and commercial symbols to the public as an organization of cosmetic businesses operating under the 3D Brows Business System; and

WHEREAS, 3D BFG represents that it has the right and authority to franchise the use of the name **"Studio 3D Brows Lashes & PMU ™"** and certain other trademarks, trade names, service marks, logos and commercial symbols (the "Marks") for use in connection with brows, lashes & PMU businesses operated in conformity with the Business System to selected persons or entities who will comply with 3D BFG's uniformity requirements and quality standards; and

WHEREAS, the FRANCHISEE desires to operate a Studio 3D Brows salon business at the location designated in Article 1 of this Agreement which will conform to the uniformity requirements and quality standards established and promulgated from time to time by 3D BFG; and

WHEREAS, 3D BFG is willing to provide the FRANCHISEE with marketing, advertising, technology, operational and other business information, experience and "know how" about the Studio 3D Brows salon business that has been developed over time by 3D BFG at significant cost and expense; and

WHEREAS, the FRANCHISEE acknowledges that it would take substantial capital and human resources to develop a business similar to the Studio 3D Brows' salon business and, as a consequence, the FRANCHISEE desires to acquire the right to use the Marks and the Business System and to own and operate a Studio 3D Brows' salon business subject to and under the terms and conditions set forth in this Agreement; and

WHEREAS, the FRANCHISEE acknowledges that 3D BFG would not provide the FRANCHISEE with any business information or "know how" about the 3D Brows Business System unless the FRANCHISEE agreed to comply with all of the terms and conditions of this Agreement and to pay the Initial Fee, the Continuing Fees, and the Advertising Fees specified in this Agreement; and

WHEREAS, the FRANCHISEE has had a full and adequate opportunity to be thoroughly advised of the terms and conditions of this Agreement by legal counsel or another adviser, and has had sufficient time to evaluate and investigate the 3D Brows' Business System, the financial investment requirements, and the business risks associated with owning and operating a Studio 3D Brows salon business;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth in this Agreement and for other good and valuable consideration, the parties hereby contract as follows:

4

# ARTICLE 1

## FRANCHISED LOCATION: GRANT OF FRANCHISE

**1.1** **FRANCHISED LOCATION.** 3D BFG grants to the FRANCHISEE a nonexclusive personal right to operate one Studio 3D Brows' salon business in conformity with the 3D Brows Business System (the "3D Brows Business" or the "Business") and further grants the FRANCHISEE a non-exclusive personal right to operate the Business using the name Studio 3D Brows Lashes & PMU ™ at the location described in Exhibit 4 to this agreement, (the "Franchised Location"). This Agreement also gives each FRANCHISEE an exclusive territory of two (2) miles around the Franchised Location for the term of this Agreement. This Agreement does not grant any other exclusive territorial rights to the FRANCHISEE, and 3D BFG will have the absolute right to open and operate, and to grant to other franchisees the right to open and operate, Studio 3D Brows' salon businesses in conformity with the Business System using the Marks at locations anywhere and over the internet.

**1.2** **FRANCHISED LOCATION NOT DETERMINED.** In the event the Franchised Location has not yet been determined as of the date of this Agreement, then the geographical area in which the FRANCHISEE'S Studio 3D Brows' salon Business is to be located will be described or defined in an exhibit signed by the parties and attached to this Agreement. At such time as the address of the Franchised Location is determined, then the address will be inserted into Article 1.1 of this Agreement.

**1.3** **RELOCATION.** Notwithstanding any provisions of this Agreement to the contrary, the FRANCHISEE may, with the prior written approval of 3D BFG, relocate the Franchised Location to another location during the term of this Agreement if the proposed new location does not compete with any Studio 3D Brows' salon business operated by 3D BFG or 3D BFG' Franchisees and the proposed new location is located within two (2) miles of the Franchised Location. The failure of the FRANCHISEE to obtain the written approval of 3D BFG prior to the relocation of the Franchised Location, or the failure to have the new location open for business within ten (10) business days after the Franchised Location is closed, will be a material breach of this Agreement. In the event the Franchised Location is relocated pursuant to this provision, the "new" location, including the real estate and the building, must comply with all applicable provisions of this Agreement and with 3D BFG' then-current specifications.

**1.4 DESTRUCTION OF FRANCHISED LOCATION.** In the event the Franchised Location is destroyed or rendered untenantable by hurricane, flood , fire or other casualty, the term of this Agreement will be extended for a period of time equal to the period of time that the FRANCHISEE is unable to operate its Studio 3D Brows' salon Business. IF the Franchised Location is rebuilt, repaired or restored to tenantable condition by the owner of the premises, then the FRANCHISEE must resume business operations within twelve (12) months of the date that the premises are restored to tenantable condition by the owner. The FRANCHISEE'S failure to resume business operations within such twelve (12) month period will constitute abandonment of the Business. If the premises are not restored by the owner, then the FRANCHISEE must relocate the Franchised Location pursuant to Article 1.3.

**1.5** **CONDITIONS TO FRANCHISE.** The FRANCHISEE undertakes the obligation to operate an Studio 3D Brows' salon Business at the Franchised Location under the 3D Brows Business System using the name Studio 3D Brows' Lashes & PMU™ in strict compliance with the terms and conditions of this Agreement for the entire term of this Agreement. The rights and privileges granted to the FRANCHISEE by 3D BFG under this Agreement are applicable only to the Franchised Location, are personal in nature, and may not be used elsewhere or at any other location by the FRANCHISEE.

**1.6** **PERSONAL LICENSE.** The FRANCHISEE will not have the right to franchise, subfranchise,

5

license or sublicense its rights under this Agreement. The FRANCHISEE will not assign or transfer its rights under this Agreement, except as specifically provided for in this Agreement.

## ARTICLE 2

### TERM; FRANCHISEES OPTION TO REACQUIRE FRANCHISE

**2.1    TERM.** The term of this Agreement will commence on the date set forth on Page 1 of this Agreement and shall continue until the expiration of seven (7) years from the date FRANCHISEE'S Studio 3D Brows' salon Business granted hereunder opens and commences operation. This Agreement will not be considered executed and will not be enforceable until: (A) it has been signed by 3D BFG and the FRANCHISEE, and, if the FRANCHISEE is a corporation or partnership, the personal guarantors; and (B) the signed Agreement has been delivered to the FRANCHISEE.

**2.2    RIGHTS UPON EXPIRATION.**   At the expiration of the term of this Agreement, the FRANCHISEE will have the option to reacquire the franchise for the Franchised Location pursuant to Article 2.3 of this Agreement.

**2.3    CONDITIONS TO OPTION.** At the end of the term of this Agreement, the FRANCHISEE will have the option to reacquire the franchise for the Franchised Location provided that the following conditions have been met: (A) the FRANCHISEE has given 3D BFG written notice at least one hundred eighty (180) days prior to the end of the term of this Agreement of its commitment to reacquire the franchise for the Franchised Location; (B) during the term of this Agreement, the FRANCHISEE has complied with all of the material terms and conditions of this Agreement and has complied with 3D BFG' material operating and quality standards and procedures; (C) all monetary obligations owed by the FRANCHISEE to 3D BFG have been paid or satisfied prior to the end of the term of this Agreement, and have been timely met throughout the term of this Agreement; (D) the FRANCHISEE has agreed, in writing, to make the reasonable capital expenditures necessary to remodel, modernize, upgrade and redecorate the Franchised Location and to replace and update the furniture, fixtures, supplies, equipment and techniques used in the FRANCHISEE'S Studio 3D Brows' salon Business so that the FRANCHISEE'S Business will reflect the image portrayed by 3D BFG' then-current decor and specifications; (E) the FRANCHISEE agrees to execute and comply with the then-current standard Franchise Agreement then being offered to new Franchisees by 3D BFG subject further to the provisions of Article 2.4 of this Agreement; and (F) as of the date the FRANCHISEE exercises its option to reacquire the franchise for the Franchised Location, the FRANCHISEE has the right to sublease the Franchised Location or a new location as set forth in Article 1.3 for a term of at least seven (7) years.

**2.4    TERMS OF OPTION.** The FRANCHISEE will have the option to reacquire the franchise for the Franchised Location under the same terms and conditions then being offered to other Franchisees by 3D BFG under 3D BFG' then-current standard Franchise Agreement. If the FRANCHISEE exercises its right to reacquire the franchise for the Franchised Location and executes the then-current standard Franchise Agreement, the FRANCHISEE will be required to pay an Initial Fee, the higher, of Twelve Thousand Five Hundred dollars ($12,500.00), or 25% of the then current franchise fee.

FRANCHISEE will also be required to pay the Continuing Fees, Advertising Fees and any other fees or charges at the sales specified in the then-current standard Franchise Agreement, and must comply with all other terms and conditions of 3D BFG' then-current standard Franchise Agreement. The FRANCHISEE acknowledges that the terms, conditions and economics of the then-current standard Franchise Agreement of 3D BFG may, at that time, vary in substance and form from the terms, conditions and economics of this Agreement.

6

**ARTICLE 3**

**3D BFG' RIGHT TO LICENSE MARKS**

**3.1    LICENSE OF MARKS.** 3D BFG warrants that, except as provided for herein, it has the right to license the name Studio 3D Brows' Lashes & PMU ™ and the other Marks and the Business System to the FRANCHISEE. FRANCHISEE understands and acknowledges that other persons may have rights in the Names and Marks "Studio 3D Brows' Lashes & PMU" in certain geographic areas. Any and all improvements made by the FRANCHISEE relating to the Marks or the Business System will become the sole and absolute property of 3D BFG who will have the sole and exclusive right to register and protect all such improvements in its name in accordance with applicable law. The FRANCHISEE'S right to use and identify with the Marks and the Business System will exist concurrently with the term of this Agreement and such use by the FRANCHISEE will inure exclusively to the benefit of 3D BFG. In case we are not able to maintain a federal registration of the mark, we reserve the right of obtaining state trademark protection or adopt an alternate federal mark and that will not be deem as a Franchisor's breach of contract or cause for termination.

**3.2    CONDITIONS TO LICENSE OF MARKS.** The FRANCHISEE agrees that its nonexclusive personal right lo use the name Studio 3D Brows' Lashes & PMU ™ as the name of the FRANCHISEE'S Business, and its right to use the Marks and the Business System, apply only to the Studio 3D Brows' salon Business operated at the Franchised Location and only so long as the FRANCHISEE will fully perform and comply with all of the conditions, terms and covenants of this Agreement. The FRANCHISEE will not have or acquire any rights in any of the Marks or the Business System other than the right of use as provided herein. The FRANCHISEE will have the right to use the Marks and the Business System only in the manner prescribed, directed and approved by 3D BFG in writing and will not have the right to use the Marks in connection with the sale of any products or services other than those prescribed or approved by 3D BFG. If, in the judgment of 3D BFG, the acts of the FRANCHISEE infringe upon or demean the goodwill, standards of uniformity or quality, or business image associated with the Marks or the Business System, then the FRANCHISEE will, upon written notice from 3D BFG, immediately modify its use of the Marks and the Business System in the manner prescribed by 3D BFG in writing. Any and all goodwill associated with the Marks and the Business System will inure exclusively to 3D BFG' benefit and, upon the expiration or termination of this Agreement, no monetary amount will be assigned as attributable to any goodwill associated with the FRANCHISEE'S use of the Marks or the Business System. The FRANCHISEE will at no time take any action whatsoever to contest the validity or ownership of the Marks and the goodwill associated therewith and will not allege any ownership in the Marks.

**3.3    ADVERSE CLAIMS.** If there is a claim by any party that its rights to the Marks are superior to those of 3D BFG and if 3D BFG' legal counsel opines that such claim is legally meritorious, or if there is an adjudication by a Court of competent jurisdiction that any party's rights to the Marks are superior to those of 3D BFG, then upon receiving written notice from 3D BFG, the FRANCHISEE will, at 3D BFG' expense, immediately make all changes and amendments to the Marks as may be specified by 3D BFG. If so specified, the FRANCHISEE will immediately cease using the Marks, and will, as soon as reasonably possible, commence using the new trademarks, trade names, service marks, logos and commercial symbols designated by 3D BFG in writing. The FRANCHISEE will not  make any changes or amendments whatsoever to the Marks or the Business System unless approved or specified in advance by 3D BFG in writing.

**3.4    DEFENSE OR ENFORCEMENT OF RIGHTS TO MARKS.**   The FRANCHISEE will have no right to and will not defend or enforce any rights associated with the licensed Marks or the Business System in any Court or other proceedings for or against imitation, infringement, prior use, or for any other claim or allegation. The FRANCHISEE will give 3D BFG immediate written notice of any and all claims or complaints made against or associated with the licensed Marks or the Business System and will, without compensation for its time and at its expense, cooperate in all respects with 3D BFG in any lawsuits

7

or other proceedings involving the Marks or the Business System. 3D BFG will have the sole and absolute right to determine whether it will commence or defend any litigation involving the Marks or the Business System, and the cost and expense of all litigation incurred by 3D BFG, including attorneys' fees, specifically relating to the Marks or the Business System will be paid by 3D BFG.

**3.5     FRANCHISEE'S RIGHT TO PARTICIPATE IN LITIGATION.** The FRANCHISEE may, at its expense, retain an attorney to represent it individually in all litigation and Court proceedings involving the Marks or the Business System, and will do so with respect to matters involving only the FRANCHISEE; however, 3D BFG and its legal counsel will control and conduct all litigation involving the Marks, the Business System and the rights of 3D BFG. Except as expressly provided for herein, 3D BFG will have no liability to the FRANCHISEE for any costs that the FRANCHISEE may incur in any litigation, and the FRANCHISEE will pay for all costs, including attorneys' fees, that it may incur in any litigation or proceeding arising as a result of the matters referred to under this Article, unless it tenders the defense to 3D BFG in a timely manner pursuant to and in accordance with Article, 1.6.

**3.6     TENDER OF DEFENSE BY FRANCHISEE.** If the FRANCHISEE is named as a defendant or party in any action involving the Marks or the Business System and if the FRANCHISEE is named as a defendant or party solely because the plaintiff is alleging that the FRANCHISEE does not have the right to use the Marks or the Business System licensed by 3D BFG to the FRANCHISEE at the Franchised Location pursuant to this Agreement, then the FRANCHISEE will have the right to tender the defense of the action to 3D BFG and 3D BFG will, at its expense, defend the FRANCHISEE in the action provided that the FRANCHISEE has tendered the defense of the action to 3D BFG within seven (7) days after receiving service of the pleadings or Summons and Complaint relating to the action. 3D BFG will indemnify and hold the FRANCHISEE harmless from any damages assessed against the FRANCHISEE in any actions resulting solely from the FRANCHISEE'S use of the Marks and the Business System at the Franchised Location if the FRANCHISEE has timely tendered the defense of the action to 3D BFG.

## ARTICLE 4

## INITIAL FEE: APPROVAL OF
## FRANCHISEE

*CL*

**4.1     AMOUNT OF INITIAL FEE.** The FRANCHISEE will pay 3D BFG an Initial Fee of FIFTY THOUSAND DOLLARS ($50,000.00), to be paid as indicated below:

> The entire amount of the Initial Fee will be due and payable on the date this Agreement is executed by the FRANCHISEE, unless otherwise agreed.

The Initial Fee payable by the FRANCHISEE is payment to 3D BFG for costs incurred by 3D BFG in operating its business, including general sales and administrative costs, business overhead costs, travel costs, long distance telephone calls, training, public relations, advertising, marketing and promotion, legal and accounting fees, compliance with federal and state franchising and other laws, and for the initial services, and opening assistance rendered to the FRANCHISEE described in this Agreement.

**4.2     3D BFG' RIGHT TO REJECT FRANCHISEE.** 3D BFG will have the absolute, sole and unilateral right to reject this Agreement or the FRANCHISEE if 3D BFG determines that any financial, personal or other information provided by the FRANCHISEE to 3D BFG is materially false, misleading, incomplete or inaccurate or the FRANCHISEE is not qualified or competent to properly operate the Studio 3D Brows' salon Business because such person has not successfully completed 3D BFG' mandatory training program or is deemed to be incapable of successfully completing 3D BFG' training program.

8

**4.3    REFUND OF INITIAL FEE.** In the event that the FRANCHISEE or this Agreement is rejected by 3D BFG pursuant to Article 4.2, then the Initial Fee, only if paid to 3D BFG under the provisions of Article 4.1 above, will be refundable to the FRANCHISEE after deducting all reasonable administrative and out-of-pocket expenses incurred by 3D BFG including, but not limited to, executives' and employees' salaries, costs for the time of its employees, salespersons' commissions, marketing costs, training costs, attorneys' fees, accountants' fees, travel expenses and long distance telephone calls. The FRANCHISEE will be notified by 3D BFG in writing if either this Agreement or the FRANCHISEE is rejected by 3D BFG pursuant to Article 4.2. Except as specifically set forth in this Article 4.3, the Initial Fee payable by the FRANCHISEE pursuant to Article 4.1 will not be refundable lo the FRANCHISEE.

## ARTICLE 5

## CONTINUING
## FEES

**5.1    CONTINUING FEES.** In  addition to the Initial Fee, the  FRANCHISEE will, for the  entire term of this Agreement, pay 3D BFG monthly Continuing Fees equal to a percentage of the FRANCHISEE'S  Gross Revenues, as defined herein, which are received, billed or generated by, as a result of or from the FRANCHISEE'S Studio 3D Brows' salon Business. **For the full term, that is first (1ˢᵗ) year through seventh (7ᵗʰ)** of the FRANCHISEE'S operation of its Studio 3D Brows' salon Business pursuant to this Agreement, the FRANCHISEE will pay 3D BFG a monthly Continuing Fee equal to **five percent (5%)** based on gross sales for each preceding month for the cumulative of both services and sale of products.  The Continuing Fees paid to 3D BFG will not be refundable to the FRANCHISEE under any circumstances.  After the initial term of seven years (7 years), if this agreement is renewed, the parties will agree on updated fees, which will not be less than 6% for the first year.

**5.2    FRANCHISEE'S OBLIGATION TO PAY CONTINUING FEES.** The Continuing Fees payable to 3D BFG under this Article will be calculated and paid to 3D BFG by the FRANCHISEE on a monthly basis during the entire term of this Agreement, and the FRANCHISEE'S failure to pay the monthly Continuing Fees to 3D BFG will be a material breach of this Agreement. The FRANCHISEE'S obligation to pay 3D BFG the monthly Continuing Fees under the terms of this Agreement will be absolute and unconditional and will remain in full force and effect until the term of this Agreement has expired. The FRANCHISEE will not have the right to "offset" and, as a consequence, the FRANCHISEE will timely pay all monthly Continuing Fees due 3D BFG under this Agreement regardless of any claims or allegations of liability for damages or other payments that the FRANCHISEE may allege against 3D BFG.

**5.3    DATE PAYABLE.** The monthly Continuing Fees payable by the FRANCHISEE must be paid to and received by 3D BFG on or before the close of business on the <u>third business day</u> of each new month. The monthly Continuing Fees must be paid and submitted with the FRANCHISEE'S monthly report of Gross Revenues required under Article 19 of this Agreement.  As continuing fees are based on the gross revenue, gross revenue reports are necessary for Franchisor's audit and for marketing strategies implementation and support to Franchisee.  This report shall be submitted with payment.

**5.4    INTEREST ON UNPAID CONTINUING FEES.**  If the FRANCHISEE fails to remit the monthly Continuing Fees due to 3D BFG by the third business day of each new month, as provided for in this Agreement, then the unpaid monthly Continuing Fees due to 3D BFG will bear interest at the maximum legal rate allowable in the state in which the FRANCHISEE'S Studio 3D Brows' salon Business is located. In no event, however, will the rate of interest payable by the FRANCHISEE on the unpaid monthly Continuing Fees due 3D BFG under this Article exceed eighteen percent (18%) per

9

annum simple interest even if the laws of that state permit a higher annual interest rate. For the case of fees based on gross revenue,  if the FRANCHISEE does not submit a report of Gross Revenues pursuant to Article 19, then 3D BFG will have the right to estimate the amount of the Continuing Fees payable by the FRANCHISEE, and the estimated unpaid monthly Continuing Fees will bear interest at the rate set forth above. The FRANCHISEE will pay 3D BFG for any and all costs incurred by 3D BFG in the collection of unpaid and past due Continuing Fee payments including, but not limited to, 3D BFG' actual attorneys' fees, deposition costs, expert witness fees, investigation costs, accounting fees, filing fees, and travel expenses.

ARTICLE 6

ADVERTISING

**6.1    ADVERTISING FEES.** The FRANCHISEE will, for the entire term of this Agreement, pay 3D BFG a monthly Advertising Fees equal to **One Percent (1%)** of gross sales for the preceding calendar month, which sales cover both services and products,  for deposit in an advertising fund which will be administered and controlled exclusively by 3D BFG.  Advertising Fee payments shall be due on the third business day of each month. The FRANCHISEE'S failure to pay the Advertising Fees will be a material breach of this Agreement. 3D BFG will have the right to use the advertising fund monies to purchase and pay for any services or products relating to advertising for any or all 3D BFG' Studio 3D Brows' salon Franchisees, including the purchase of production materials, ad slicks, brochures, radio and television commercials, services provided by advertising agencies, market research and development costs, advertising and promotion development and production (including all costs relating lo media costs for television, radio, newspaper, direct mail and point-of-purchase advertising, and all costs of collateral materials required for such advertising), creative costs, product research costs, internet website costs, all costs and expenses incurred in administering the advertising fund (including, but not limited to, salaries, travel expenses, office supplies, and related  general and administrative expenses), and all other costs relating to the advertising, and promotion of any and all 3D BFG's  Studio 3D Brows' salon Businesses. The use of the monies in the advertising fund and the administration of the advertising fund will be under the absolute direction and control of 3D BFG. 3D BFG will have the absolute right to determine the advertising agencies that will be retained, the type, content and frequency of the advertising, and all other matters pertaining to the expenditures made by 3D BFG from the advertising fund. 3D BFG will have no fiduciary duty to the FRANCHISEE with respect to collection or expenditure of the Advertising Fees, and any advertising fund will not be a trust or escrow account. 3D BFG will not be required to contribute to the advertising fund; however, all Studio 3D Brows' salon businesses that are owned and operated by 3D BFG will be required to contribute to the advertising fund. The Advertising Fees paid by the FRANCHISEE will not be refundable to the FRANCHISEE under any circumstances.

**6.2    3D BFG' USE OF ADVERTISING FEES IN FRANCHISEE'S DMA.**    Unless otherwise implemented by 3D BFG,  commencing on the first day of July following the effective date of this Agreement, and continuing each year (programmed advertising year of July 1 through June 30) for the remaining term of this Agreement, 3D BFG will spend for advertising and promotion (including, but not limited to, advertising agency fees) in the FRANCHISEE'S Designated Market Area ("DMA"), as defined herein, at least fifty percent (50%) of the monthly Advertising Fees paid into the advertising fund by the FRANCHISEE. Such expenditures by 3D BFG may take the form of reimbursing the FRANCHISEE for advertising expenditures approved by 3D BFG and made by the FRANCHISEE in its DMA;  provided, however, such expenditures by the FRANCHISEE must be in addition to any advertising expenditures required pursuant to Articles 6.4 and 6.5 and any other provisions of this Agreement.

**6.3    DATE PAYABLE; INTEREST ON UNPAID ADVERTISING FEES.** The monthly Advertising Fees must be paid directly to and received by 3D BFG on or before the close of business on the third business day of each month. Any Advertising Fees not paid by the FRANCHISEE as

10

required herein will bear interest at the maximum legal rate applicable in the state in which the FRANCHISEE'S Studio 3D Brows' salon Business is located. In no event, however, will the rate of interest payable by the FRANCHISEE on the unpaid balance due for Advertising Fees exceed eighteen percent (18%) per annum simple interest. In the case that advertising fees are based on gross sales, if the FRANCHISEE does not submit a report of Gross Revenues pursuant to Article 19, then 3D BFG will have the right to estimate the amount of the Advertising Fees payable by the FRANCHISEE, and the estimated unpaid monthly Advertising Fees will bear interest at the rate set forth above. The FRANCHISEE will pay 3D BFG for any and all costs incurred by 3D BFG in the collection of unpaid and past due Advertising Fee payments, including, but not limited to, 3D BFG' actual attorneys' fees, deposition costs, expert witness fees, investigation costs, accounting fees, filing fees and travel expenses. 3D BFG will have the right to collect unpaid Advertising Fees in its own name or on behalf of the advertising fund; however, all Advertising Fees collected will be deposited in the advertising fund.

**6.4     LOCAL ADVERTISING.** In addition to payment of the Advertising Fees required by Article 6.1 above, FRANCHISEE must spend during each consecutive twelve (12) month period beginning with the date the Franchised Location opens for business, at least one percent (1%) of its Gross Revenues during such period for approved local media advertising and promotion. All local media advertising and promotions conducted by the FRANCHISEE must conform to 3D BFG' standards for media advertising and promotions. Prior to implementing any Local Advertising, the Franchisee shall submit to the Franchisor for approval all advertising and promotional material proposed to be used in connection with such advertising. The Franchisor may (but shall not be obligated to) provide to the Franchisee, at the Franchisee's request and expense, promotional plans and materials for such Local Advertising.

**6.5   STUDIO IMAGE.**  3D BFG shall have the right to photograph the interior and exterior of the Franchisee's Salon and to use these photographs in any Marketing or promotional material. 3D BFG shall not be obligated to compensate the Franchisee for use of the Franchisee's Salon or employees in any Marketing or promotional material. The Franchisee shall cooperate in securing the consent of persons photographed.

**6.6 ALTERNATE USE OF ADVERTISING FEES.** If a local DMA advertising group is established for the FRANCHISEE'S DMA, 3D BFG may, as an alternative to the advertising and promotional expenditures required to be made by 3D BFG in the FRANCHISEE'S DMA pursuant to Article 6.2 above; contribute this amount to the local DMA advertising group for the FRANCHISEE'S DMA.

**6.7     YELLOW PAGES ADVERTISING.**  The FRANCHISEE will, at its expense, be required to advertise continually in the Yellow Pages of the local telephone directories **(either hard copy or web)** using trademark listings or display formats approved by 3D BFG under an appropriate listing that is in compliance with the laws of the state in which the Franchised Location is located including, but not limited to, "PMU" or "Cosmetic" or "Beauty". Expenditures by the FRANCHISEE for Yellow Pages advertising may be applied to the advertising requirements set forth in Article 6.4 of this Agreement.

**6.8     GRAND OPENING ADVERTISING.** The FRANCHISEE will be required to pay 3D BFG the amount of Four Thousand Dollars ($4,000.00) to implement and conduct grand opening advertising.   FRANCHISEE should also incur in additional grand opening, marketing, public relations and promotional programs for its Studio 3D Brows' salon Business which have been approved by 3D BFG in writing. Expenditures by the FRANCHISEE for grand opening advertising may be applied to the monthly local media advertising and promotional expenditures required pursuant to Article 6.4 of this Agreement.

## ARTICLE 7

### QUALITY CONTROL, UNIFORMITY AND STANDARDS
### REQUIRED OF THE FRANCHISEE

11

3D BFG will promulgate, from time to time, uniform standards of quality and service regarding the business operations of the FRANCHISEE'S Studio 3D Brows' salon Business so as to protect and maintain (for the benefit of all Studio 3D Brows' salon Franchisees and 3D BFG) the distinction, valuable goodwill and uniformity represented and symbolized by the Marks and the Business System. Accordingly, to insure that all   Studio 3D Brows' salon Franchisees will maintain the uniform, requirements and quality standards for products and services associated with the Marks and the Business System, the FRANCHISEE agrees to maintain the uniformity and quality standards required by 3D BFG for all products and services and  agrees to comply with the provisions of this Article to assure the public that all Studio 3D Brows' salon businesses will be uniform in nature and will sell and dispense quality products and services.

**7.1     IDENTIFICATION OF BUSINESS.** The FRANCHISEE will operate its business so that it is clearly identified and advertised as a Studio 3D Brows' salon Business. However, the style and form of the word Studio 3D Brows' Lashes & PMU ™ in any advertising, marketing, public relations, telemarketing or promotional program must have the prior written approval of 3D BFG and must conform to 3D BFG' standards and requirements for use of the Marks. The FRANCHISEE will use the name Studio 3D Brows' Lashes & PMU ™ and all graphics commonly associated with the Marks which now or hereafter may form a part of 3D BFG' Business System on all paper supplies, furnishings, advertising materials, signs, stationery, business cards and other articles in the identical combination and manner prescribed by 3D BFG in writing. The FRANCHISEE will, at its expense, comply with all notices of registration required by 3D BFG and will, at its expense, comply with any other trademark, trade name, service mark, copyright, patent or other notice marking requirements that are required by 3D BFG or by applicable law.

**7.2     IDENTIFICATION AS FRANCHISEE.** The FRANCHISEE will not use the words Studio 3D Brows' Lashes & PMU ™ or any combination of these words in its corporate, partnership or sole proprietorship name. The FRANCHISEE will hold itself out to the public as an independent contractor operating its Studio 3D Brows' salon Business pursuant to a franchise from 3D BFG. The FRANCHISEE will clearly indicate on its business checks, stationery, purchase orders, business cards, receipts, promotional materials and other written materials that the FRANCHISEE is an  Studio 3D Brows' salon Franchisee. The FRANCHISEE will display a sign, to be provided by 3D BFG, at the Franchised Location which is clearly visible to the general public indicating that the Business is independently owned and operated as a franchised business. The FRANCHISEE will file for a Certificate of Assumed or Fictitious Name in the manner required by law so as to notify the public that the FRANCHISEE is operating the franchised Studio 3D Brows' salon Business as an independent business pursuant to this Agreement.

**7.3     SIGNS.** The FRANCHISEE will display only the approved 3D Brows' Sign (the "Sign") and will not use or display any other signs of any kind or nature without the express prior written approval of 3D BFG.

**7.4     ADVERTISING MATERIALS.**  The FRANCHISEE will use only approved advertising and promotional materials for the advertising and promotions conducted by the FRANCHISEE.   The FRANCHISEE must obtain written approval from 3D BFG prior to using any other advertising or promotional materials. (Supplemented by Exhibit 5).

**7.5     COMPLIANCE WITH STANDARD STORE LAYOUTS AND PLANS.** The Franchised Location and the FRANCHISEE'S business premises must conform to 3D BFG' approved store layouts, floor plans, specifications, exterior and interior decorating designs and color schemes. The FRANCHISEE will not make any architectural, structural, design or decorating changes to the interior or exterior of the Franchised Location without 3D BFG' prior written approval. The FRANCHISEE will be solely responsible for ascertaining and insuring that the Franchised Location and the business premises are constructed or remodeled according to all applicable local, state and

12

federal laws, ordinances, statutes and building codes, including compliance with the Americans with Disabilities Act. The furniture, fixtures, supplies and equipment used in the Franchised Location must conform to the quality standards and uniform requirements established by 3D BFG from time to time. 3D BFG may require the use of certain pre-approved architects and contractors, which contact list will be made available to FRANCHISEE after this agreement is fully executed. Otherwise, the architect and contractor to be used, should be approved by 3D BFG after submittal of the proposals and curriculum of these.

**7.6      PERIODIC REMODELING.** The FRANCHISEE will be required to periodically make the reasonable capital expenditures necessary to remodel, modernize and redecorate the Franchised Location   and the FRANCHISEE'S business premises, and to replace and modernize the FRANCHISEE'S furniture, fixtures, supplies and equipment so that the Franchised Location and the FRANCHISEE'S business premises will reflect the then-common image intended to be portrayed by 3D BFG ("remodeling"). All remodeling of the Franchised Location and the FRANCHISEE'S business premises must be done in accordance with the standards and specifications as prescribed by 3D BFG from time to time and with the prior written approval of 3D BFG. All replacements for the furniture, fixtures, supplies and equipment must conform to 3D BFG' then-current quality standards and must be approved by 3D BFG in writing. The FRANCHISEE will begin remodeling the Franchised Location within three (3) months from the date that the FRANCHISEE receives written notice from 3D BFG specifying the required remodeling and will diligently complete such remodeling within a reasonable time after its commencement. Except as provided in Article 7.12 of this Agreement, the FRANCHISEE will not be required to remodel the Franchised Location or to replace and modernize its furniture, fixtures, supplies and equipment more than once every five (5) years during the term of this Agreement. The FRANCHISEE'S failure to comply with the requirements of this Article 7.6 will be a material breach of this Agreement.

**7.7      USE OF MARKS AND BUSINESS SYSTEM.** The FRANCHISEE will use the Marks and the Business System in strict compliance with the quality standards, moral and ethical standards, operating procedures, specifications, requirements and instructions required by 3D BFG, which may be amended and supplemented by 3D BFG from time to time.

**7.8      PRODUCTS AND SERVICES.** The FRANCHISEE will offer for sale all, but only those, products and services prescribed and approved by 3D BFG in writing. The FRANCHISEE will conform to all customer service standards prescribed by 3D BFG in writing. The FRANCHISEE will sell all products and services at prices pre-approved by 3D BFG and on whatever terms it deems appropriate. When selling products other than those of 3D BFG brands or lines represented by 3D BFG, the FRANCHISEE will suggest a retail price for 3D BFG approval, which approval will not be unreasonably withheld or denied. The FRANCHISEE will only sell the approved products and services to the FRANCHISEE'S retail customers at the Franchised Location and will not sell any products or services at retail or wholesale at or from any other location or through the Internet.

**7.9      OPERATIONS MANUAL.** 3D BFG will provide the FRANCHISEE with one copy of 3D BFG' confidential Operations Manual (the "Manual") or make the Manual available to FRANCHISEE (e.g.-via email or electronically by posting the Manual on the Internet) or by any other means. The FRANCHISEE will conform to the common image and identity created by the products and services associated with Studio 3D Brows' salon businesses which are portrayed and described by the Manual, and the FRANCHISEE will conform to all changes and modifications made to the Manual by 3D BFG and provided to the FRANCHISEE that are deemed necessary by 3D BFG to: (A) improve the standards of service and products offered for sale to the public under the Business System; (B) protect the goodwill associated with the Marks; (C) improve the operation of the FRANCHISEE'S Studio 3D Brows' salon Business; or (D) maintain the product and service consistency required by 3D BFG. 3D BFG reserves the right to revise the Manual at any time during the term of this Agreement. The Manual and all written supplements, changes and modifications to the Manual are confidential in all respects and are and will remain the sole and exclusive property of 3D BFG. The FRANCHISEE will not use the Manual or any

13

information contained therein in connection with the operation of any other business or for any purpose other than the operation of the FRANCHISEE'S Studio 3D Brows' salon Business.

**7.10 POINT OF SALE AND BACK OFFICE SYSTEM.** FRANCHISEE must use the then current 3D BFG' computerized point of sale system (the "POS") and franchise back office system ("FBOS"), as herein described or as determined by 3D BFG from time to time. The FRANCHISEE will acquire the POS and FBOS hardware and software from 3D BFG or its designee in accordance with the then current acquisition and service agreements for POS and FBOS or acquire it as part of the equipment required. The FRANCHISEE agrees to provide 3D BFG with independent electronic remote access to any and all information stored on the POS and FBOS at such reasonable times as 3D BFG may designate. 3D BFG shall have the right from time to time to make reasonable changes, modifications, or additions to the standards, specifications and/or requirements for the POS and/or the FBOS. Any such changes, modifications or additions shall automatically be binding upon FRANCHISEE upon the giving of notice of same to FRANCHISEE by 3D BFG.

**7.11 APPROVED SUPPLIERS.** The FRANCHISEE will purchase from suppliers approved in writing by 3D BFG all products, goods, merchandise, supplies, sundries, toiletries, grooming aids, furniture, fixtures, equipment and services (sometimes referred to in this Agreement as "goods and services") to be used or sold by the FRANCHISEE in conjunction with the operation of its Studio 3D Brows' salon Business which 3D BFG determines meet the standards of quality and uniformity required to protect the valuable goodwill and uniformity symbolized by and associated with the Marks and the Business System. The FRANCHISEE will have the right and option to purchase all goods and services from other or outside suppliers provided that such goods and services conform in quality to 3D BFG' standards and specifications. If the FRANCHISEE desires to purchase any goods and services from other suppliers, then, if requested by 3D BFG, the FRANCHISEE will submit samples, specifications, and information regarding the manufacturer to 3D BFG for review to determine whether the goods and services comply with 3D BFG' standards and specifications. Any expenses incurred by 3D BFG in evaluating unapproved products will be paid by the FRANCHISEE. The written approval of 3D BFG must be obtained by the FRANCHISEE prior to the time that any previously unapproved goods and services are used or sold at the FRANCHISEE'S Studio 3D Brows' salon Business. All such goods and services must be those classified as "professional" goods and services sold or provided only in professional cosmetic salons.

**7.12 REPAIR AND MAINTENANCE.** The FRANCHISEE will, at its expense, repair, paint and keep in a clean and sanitary condition the interior, the exterior and, where applicable, the grounds of the Franchised Location and the FRANCHISEE'S business premises, and will replace all floor coverings, wall coverings, light fixtures, curtains, blinds, shades, furniture, room furnishings, wall hangings, fixtures and other decor items as such items become worn-out, soiled or are in disrepair. All equipment will be kept in good working order by the FRANCHISEE at all times and will meet 3D BFG' quality standards. All replacement equipment must comply with 3D BFG' then-current standards and specifications.

**7.13 COMPLIANCE WITH APPLICABLE LAWS.** The FRANCHISEE will, at its expense, comply with all applicable federal, state, city, local and municipal laws, ordinances, rules and regulations pertaining to the operation of the FRANCHISEE'S Business, including all laws relating to employees and to the regulation of beauty and cosmetologists and all applicable federal and state environmental laws. The FRANCHISEE will, at its expense, be absolutely and exclusively responsible for determining the licenses and permits required by law for the FRANCHISEE'S Business, for qualifying for and obtaining all such licenses and permits, and for maintaining all such licenses and permits in full force and effect. The FRANCHISEE has had an opportunity to obtain legal advice regarding, and currently complies with, all applicable legal requirements that prohibit unfair, fraudulent or corrupt business practices, including U.S. and other legal requirements that are designed to combat terrorism and terrorist activities. In addition, neither the FRANCHISEE nor any holder of an ownership interest in the FRANCHISEE is named as a specially designated national" or "blocked person" as designated by the

14

United Stales Department of the Treasury's Office of Foreign Assets control under the U.S. PATRIOT Act. **(See Exhibit G)**

**7.14    PAYMENT OF OBLIGATIONS.** The FRANCHISEE must timely pay all of its non-contested and liquidated obligations and liabilities due and payable to 3D BFG, and to suppliers, lessors and creditors of the FRANCHISEE. The FRANCHISEE'S failure to timely pay all such obligations will be a material breach of this Agreement.

**7.15    PAYMENT OF TAXES.** The FRANCHISEE will be absolutely and exclusively responsible and liable for filing all required tax returns and for the prompt payment of all federal, state, city and local taxes including, but not limited to, individual and corporate income taxes sales and use taxes, franchise taxes, gross receipts taxes, employee withholding taxes, F.I.C.A. taxes and personal property and real estate taxes payable in connection with the FRANCHISEE'S Business. 3D BFG will have no liability for these or any other taxes and the FRANCHISEE will indemnify 3D BFG for any such taxes that may be assessed or levied against 3D BFG which arise or result from the FRANCHISEE'S Studio 3D Brows' salon Business. It is expressly understood and agreed by the Personal Guarantors to this Agreement that their personal guaranty applies to the prompt filing of all returns and the prompt payment of all taxes which arise or result from the FRANCHISEE'S Studio 3D Brows' salon Business,

**7.16    REIMBURSEMENT OF 3D BFG FOR TAXES.** In the event any "franchise" or other tax (other than income taxes) which is based upon the Gross Revenues, receipts, sales, business activities or operation of the FRANCHISEE'S Business is imposed upon 3D BFG by any taxing authority, then the FRANCHISEE will reimburse 3D BFG in an amount equal to the amount of such taxes and related costs imposed upon and paid by 3D BFG. The FRANCHISEE will be notified in writing when 3D BFG is entitled to reimbursement for the payment of such taxes and, in that event, the FRANCHISEE will pay 3D BFG the amount specified in the written notice within ten (10) days of receipt of the written notice.

**7.17    BUSINESS HOURS; PERSONNEL.** The FRANCHISEE'S Studio 3D Brows' salon Business will be open for business on such days and for such hours as 3D BFG may designate. The FRANCHISEE will, during business hours, have a salon manager on duty who is responsible for supervising the staff and the business operations of the FRANCHISEE'S Business. The FRANCHISEE will have a sufficient number of adequately trained and competent personnel on duty at all times to guarantee efficient service to the FRANCHISEE'S customers. Operation start-up will consist of the staff stated in Exhibit 3  The FRANCHISEE will require its employees to wear the standard attire or uniforms approved by 3D BFG. All persons employed by the FRANCHISEE must practice good personal hygiene and must wear clean and neat attire or uniforms, as required and approved by 3D BFG. 3D BFG encourages the FRANCHISEE to employ at least one (1) full-time person (a "District Manager") for each six (6) Studio 3D Brows' salon Businesses owned and operated by the FRANCHISEE, for the case of development agreements. Each District Manager will be responsible for the operation and administration of up to six (6) Studio 3D Brows' salon Businesses under his or her supervision and control, including supervision of the salon managers and assistant managers. The District Managers must devote their full time and attention to administering and overseeing the operations of the FRANCHISEE'S Studio 3D Brows' salon Businesses. All District Managers must attend and successfully complete the training program required by 3D BFG, and be certified and approved by 3D BFG in writing.

**7.18    3D BFG' INSPECTION RIGHTS.** 3D BFG will have the absolute right to inspect and take photographs and videotapes of the interior and exterior of the Franchised Location at all reasonable times during business hours, to interview the FRANCHISEE'S personnel, to examine, representative samples of all goods and equipment sold or used at the FRANCHISEE'S Studio 3D Brows' salon Business, and to evaluate the quality of the services provided by the FRANCHISEE to its customers. 3D BFG will have the right to use all photographs and videotapes of the FRANCHISEE'S Studio 3D Brows' salon

15

Business for such purposes as 3D BFG deems appropriate including, but not limited to, use in advertising, marketing and promotional materials, and as evidence in any court or arbitration proceeding. The FRANCHISEE will not be entitled to, and hereby expressly waives, any right that it may have to be compensated by 3D BFG, its advertising agencies or any other Studio 3D Brows' salon franchisees for the use of such photographs or videotapes for advertising, marketing, promotional or litigation purposes.

7.19 **SECURITY INTEREST.** This Agreement and the franchise granted to the FRANCHISEE hereunder may not be the subject of a security interest, lien, levy, attachment or execution by the FRANCHISEE'S creditors or any financial institution, except with the prior written approval of 3D BFG.

7.20 **CREDIT CARDS**. The FRANCHISEE will honor all credit cards approved by 3D BFG, The FRANCHISEE must obtain the written approval of 3D BFG prior to honoring any previously unapproved credit cards or other credit devices.

7.21 **DEFAULT NOTICES**. The FRANCHISEE will immediately deliver to 3D BFG a copy of any notice of default received from any landlord for the Franchised Location or from any mortgagee, trustee under any deed of trust or lessor with respect to the FRANCHISEE'S Studio 3D Brows' salon Business, and copies of all notifications of any lawsuits, contract breaches, consumer claims, federal or state administrative or agency proceedings or investigations, or other civil or governmental claims, actions or proceedings relating to the FRANCHISEE'S Studio 3D Brows' salon Business. Upon request from 3D BFG, the FRANCHISEE will provide additional information as may be required by 3D BFG regarding the alleged default, lawsuit, claim or proceeding or any subsequent action or proceeding in connection with the alleged default, lawsuit, claim or proceeding.

7.22 **SALE OF CAPITAL STOCK TO PUBLIC**. If the FRANCHISEE is a corporation and desires to sell any part of its authorized capital stock to the public, then the FRANCHISEE will provide 3D BFG with a copy of the proposed Disclosure Document or prospectus for its review prior to the time that the Disclosure Document or prospectus is filed with any state securities commission or the Securities and Exchange Commission. The shareholders of the FRANCHISEE who owned the capital stock of the FRANCHISEE prior to the public offering will, at all times, retain at least a fifty-one percent (51%) ownership of the issued and outstanding shares of stock of the FRANCHISEE. 3D BFG will have the right to attend all "due diligence" meetings held in preparation for the offer to sell the FRANCHISEE'S capital stock to the public, and the FRANCHISEE will give 3D BFG at least five (5) business days prior written notice of such meetings. The FRANCHISEE will not offer its capital stock by use of the name Studio 3D Brows' Lashes & PMU ™ or any name deceptively similar thereto. The FRANCHISEE will not have the right to sell any of its capital stock to the public or to any other person or entity until the FRANCHISEE has complied in all respects with all applicable provisions of this Agreement, including the applicable provisions of Articles 13 and 20.

7.23 **OPERATION OF 3D BFG BUSINESS**. The FRANCHISEE will be totally and solely responsible for the operation of its Studio 3D Brows' salon Business, and will control, supervise and manage all the employees, agents and independent contractors who work for or with the FRANCHISEE. The-FRANCHISEE will be responsible for the acts of its employees, agents and independent contractors, and will take all reasonable business actions necessary to ensure that its employees, agents and independent contractors comply with all federal, state and local laws, rules and regulations including, but not limited to, all employment laws, discrimination laws, sexual harassment laws and laws relating to the disabled. 3D BFG will not have any right, obligation or responsibility to control, supervise or manage the FRANCHISEE'S employees, agents or independent contractors. The FRANCHISEE shall not operate, directly or indirectly, nor allow the operation of, any other business within or in connection with the Franchised Location, including the rental of salon chairs or booths to anyone.

16

**7.24** **PARTICIPATION IN CERTAIN PROGRAMS AND PROMOTIONS.** The FRANCHISEE must honor all terms and conditions of any customer relations, warranty, promotional, gift certificate, gift card, complimentary pass or similar programs established by 3D BFG for the 3D Brows franchise system and is responsible for buying any required equipment, software or materials and paying any fees and costs associated with its participation in such program. FRANCHISEE is also responsible for compliance with any laws applicable to abandoned property and escheat. In addition, the FRANCHISEE must participate in any system-wide program developed by 3D BFG to build brand awareness and promote customer loyalty for the 3D Brows franchise system and pay any costs associated with its participation in such program.

**7.25** **USE OF INTERNET.** The FRANCHISEE'S conduct on the Internet, including without limitation, its use of the Marks on the Internet and in domain names for the Internet, is subject to the provisions of this Agreement. 3D BFG reserves the right to establish and modify, from time to time, rules which will govern the FRANCHISEE'S conduct and use of the Internet in connection with the FRANCHISEE'S Studio 3D Brows' salon Business, and the FRANCHISEE agrees to abide by such rules. The FRANCHISEE'S right to use the Marks and the Business System on the Internet will terminate when this Agreement terminates or expires.

**ARTICLE 8**

**CONFIDENTIAL OPERATIONS MANUAL AND OTHER INFORMATION**

**8.1** **COMPLIANCE WITH MANUAL.** In order to protect the reputation and goodwill of 3D BFG and to maintain uniform operating standards under the Marks and the Business System, the FRANCHISEE will at all times during the term of this Agreement conduct its Business in accordance with 3D BFG' confidential Operations Manual (the "Manual"). The FRANCHISEE shall receive as a loan or be given electronic access to one copy of the Manual from 3D BFG.

**8.2** **CONFIDENTIALITY OF MANUAL.** The FRANCHISEE must, at all times during the term of this Agreement and thereafter, treat the Manual, any other manuals created for or approved for use in the operation of the FRANCHISEE'S Studio 3D Brows' salon Business, and the information contained therein as secret and confidential, and the FRANCHISEE will use all reasonable means to keep such information secret and confidential. Neither the FRANCHISEE nor its personnel will make any copy, duplication, record or reproduction of the Manual, or any portion thereof, available to any unauthorized person.

**8.3** **REVISION TO MANUAL.** The Manual will, at all times during the term of this Agreement and thereafter, remain the sole and absolute property of 3D BFG. 3D BFG may from time to time revise the Manual and the FRANCHISEE expressly agrees to operate its Studio 3D Brows' salon Business in accordance with all such revisions. The FRANCHISEE will at all times keep its copy of the Manual current and up-to-date, and in the event of any dispute, the terms of the master copy of the Manual maintained by 3D BFG will be controlling in all respects.

**8.4** **OTHER CONFIDENTIAL INFORMATION.** The FRANCHISEE expressly acknowledges and agrees that 3D BFG will be disclosing and providing to the FRANCHISEE certain confidential and proprietary information concerning the Business System and the procedures, technology, operations and data used in connection with the Business System. Accordingly, the FRANCHISEE will not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person or entity any confidential information, knowledge or know-how concerning the methods of operation of a Studio 3D Brows'

17

salon business which may be communicated to the FRANCHISEE, or of which the FRANCHISEE may be apprised, by virtue of this Agreement. The FRANCHISEE will divulge such confidential information only to its personnel who must have access to it in order to operate the FRANCHISEE'S Studio 3D Brows' salon Business. Any and all information, knowledge and know-how including, without limitation, vendor and supplier lists, customer lists, drawings, materials, equipment, technology, methods, procedures, specifications, techniques, computer programs, systems and other data which 3D BFG designates as confidential or proprietary will be deemed confidential and proprietary for the purposes of this Agreement. If FRANCHISEE is also a franchisee of any other brand of 3D BFG or its subsidiaries or affiliates, FRANCHISEE shall not use or disclose information of one brand in connection with the operation of any other brand.

**8.5     CONFIDENTIALITY AGREEMENTS WITH PERSONNEL.** The FRANCHISEE will require all of the FRANCHISEE'S personnel who have access to the Manual or other confidential information to execute an agreement, in the form attached hereto as Exhibit "1" or other form satisfactory to 3D BFG, where the staff member agree to maintain the confidentiality, during the course of their employment or hiring, and thereafter, of all information designated by 3D BFG as confidential. Copies of all executed agreements will be submitted to 3D BFG upon request.

**8.6     REMEDIES.** The FRANCHISEE recognizes that the provisions contained in this Article are necessary for the protection of 3D BFG and all of the franchisees who own Studio 3D Brows' salon businesses. If the FRANCHISEE violates any provisions of this Article, or if any personnel of the FRANCHISEE violates his or her confidentiality agreement executed pursuant to Article 8.5, then 3D BFG will have the right to: (A) terminate this Agreement (as provided for herein); (B) seek injunctive relief from a Court of competent jurisdiction; (C) commence an action or lawsuit against the FRANCHISEE for damages; and (D) enforce all other remedies against the FRANCHISEE that are available to 3D BFG under common law, in equity, and pursuant to any federal and state statutes in an action or lawsuit against the FRANCHISEE.

**ARTICLE 9**

**3D BFG' TERMINATION RIGHTS**

**9.1     GROUNDS FOR TERMINATION.** In addition to the other rights of termination contained in this Agreement, 3D BFG will have the right and privilege to terminate this Agreement if: (A) the FRANCHISEE fails to open and commence operations of its Studio 3D Brows' salon Business within one-hundred eighty (180) days of the Effective Date of this Agreement or in the event 3D BFG or one of its affiliates is the lessee under a lease for the Franchised Location, the commencement date of such lease; (B) the FRANCHISEE violates any material provision, term or condition of this Agreement or FRANCHISEE'S sublease including, but not limited to, failure to timely pay the Initial Fee or any Continuing Fees, Advertising Fees, monetary obligations or other fees to 3D BFG or to landlord under the sublease; (C) the FRANCHISEE fails to conform to the Business System, the standards of uniformity and quality for the goods and services or the policies and procedures promulgated by 3D BFG in connection with the Business System, or is involved in any act or conduct which materially impairs the goodwill associated with the Marks or the Business System; (D) the FRANCHISEE fails to timely pay any of its uncontested obligations or liabilities due and owing to 3D BFG, suppliers, banks, purveyors, other creditors or any federal, state or municipal government (including, if applicable, federal and state taxes); (E) the FRANCHISEE is determined to be insolvent within the meaning of any state or federal law, files for bankruptcy or is adjudicated a bankrupt under any state or federal law; (F) the FRANCHISEE makes an assignment for the benefit of creditors or enters into any similar arrangement for the disposition of its assets for the benefit of creditors; (G) any check issued by the FRANCHISEE is dishonored because of insufficient funds (except where the check is dishonored because of a bookkeeping or accounting error) or closed accounts and is not cured within 2 business days; (H) the FRANCHISEE fails to finance

18

or purchase and pay for the leasehold improvements, furniture, fixtures, supplies and equipment required for its Studio 3D Brows' salon Business prior to the opening of the FRANCHISEE'S Business; (I) the FRANCHISEE'S lease for the Franchisee Location is terminated or canceled for nonpayment of rent or other legal reasons; (J) the FRANCHISEE or any of its partners, directors, officers or majority stockholders is convicted of, or pleads guilty or no contest to, a charge of violating any law relating to the FRANCHISEE'S Studio 3D Brows' salon Business or any felony; (K) the FRANCHISEE voluntarily or otherwise abandons, as defined herein, the Studio 3D Brows' salon Business; (L) diverts, at any time, any business, or any of the products from the Franchise, including the sale of any care product to a non end user consumer from the Franchised location or the sale of  care products through other distribution channels (including the Internet); or (M) the FRANCHISEE fails to attend and successfully complete 3D BFG orientation or initial training. A breach by FRANCHISEE of this Agreement shall be deemed a breach of any sublease between FRANCHISEE and 3D BFG or any of its subsidiaries or affiliates. A breach of any sublease between FRANCHISEE and 3D BFG or any of its subsidiaries or affiliates shall be deemed a breach of this Agreement.

**9.2** **NOTICE OF BREACH**. Except as provided for in Article 9.5 and Article 9.6 of this Agreement, 3D BFG will not have the right to terminate this Agreement unless and until written notice setting forth the alleged breach in detail has been given to the FRANCHISEE by 3D BFG and, after having been given such written notice of breach, the FRANCHISEE fails to correct the alleged breach within the period of time specified by applicable law. If applicable law does not specify a time period to correct an alleged breach, then the FRANCHISEE will have fifteen (15) days after having been given such written notice to correct the alleged breach. If the FRANCHISEE fails to correct the alleged breach set forth in the written notice within the applicable period of time, then this Agreement may be terminated by 3D BFG as provided for in this Agreement. For the purposes of this Agreement, an alleged breach of this Agreement by the FRANCHISEE will be deemed to be "corrected" if both 3D BFG and the FRANCHISEE agree in writing that the alleged breach has been corrected.

**9.3** **ARBITRATION**. If the FRANCHISEE gives notice of Arbitration, as provided for in this Agreement, within the time period established in Article 9.2 for correcting the alleged breach, then 3D BFG will not have the right to terminate this Agreement until the facts of the alleged breach have been submitted to arbitration as provided for herein, the Arbitrator determines that the FRANCHISEE has breached this Agreement and the FRANCHISEE fails to correct the breach within the applicable time period. If the Arbitrator determines that the FRANCHISEE has breached this Agreement as alleged by 3D BFG in the written notice given to the FRANCHISEE, then the FRANCHISEE will have fifteen (15) days from the date the Arbitrator issues a written determination on the matter to correct the specified breach or violation of this Agreement, except where applicable law requires a longer cure period in which event the cure period specified by applicable law will apply. If the FRANCHISEE timely corrects the specified breach of this Agreement, then this Agreement will remain in full force and effect. For the purposes of this Agreement, any controversy or dispute on the issue of whether the FRANCHISEE has timely corrected the specified breach of this Agreement will also be subject to arbitration as provided for herein. The time limitations set forth in this Article within which the FRANCHISEE may demand arbitration of a dispute or controversy relating to the right of 3D BFG to terminate this Agreement for an alleged breach will be mandatory. If the FRANCHISEE fails to comply with the time limitations set forth in this Article, 3D BFG may terminate this Agreement as provided for herein.

**9.4** **NOTICE OF TERMINATION**. If 3D BFG has complied with the notice provisions of this Article and the FRANCHISEE has not corrected the alleged breach set forth in the written notice within the time period specified in this Article, then 3D BFG will have the absolute right to terminate this Agreement by giving the FRANCHISEE written notice stating to the FRANCHISEE that this Agreement is terminated, and in that event, unless applicable law provides lo the contrary, the effective date of termination of this Agreement will be the day such written notice is given.

**9.5      GROUNDS FOR IMMEDIATE TERMINATION.** 3D BFG will have the absolute right and privilege, unless prohibited by applicable law, to immediately terminate this Agreement if: (A) the FRANCHISEE or any of its partners, directors, officers or majority stockholders is convicted of, or pleads guilty or no contest to, a charge of violating any law relating to the FRANCHISEE'S Studio 3D Brows' salon Business, or any felony; (B) the FRANCHISEE voluntarily or otherwise abandons, as defined herein, the FRANCHISEE'S Studio 3D Brows' salon Business; (C) the FRANCHISEE is involved in any act or conduct which materially impairs the goodwill associated with 3D BFG' Marks or Business System, and the FRANCHISEE fails to correct such act or conduct within eighty eight (48) hours of receipt of written notice from 3D BFG; or (D) the FRANCHISEE fails or refuses to produce its books and financial records for audit by 3D BFG in accordance with Article 19.4.

**9.6      NOTICE OF IMMEDIATE TERMINATION.** If this Agreement is terminated by 3D BFG pursuant to Article 9.5 above, 3D BFG will give the FRANCHISEE written notice that this Agreement is terminated, and in that event, unless applicable law provides to the contrary, the effective date of termination of this Agreement will be the day such written notice is given.

**9.7      DAMAGES.** In the event this Agreement is terminated by 3D BFG pursuant to Article 9, or if the FRANCHISEE breaches this Agreement by a wrongful termination or a termination that is not in accordance with the terms and conditions of Article 10 of this Agreement, then 3D BFG will be entitled to seek recovery from the FRANCHISEE for lost Continuing Fees for the period after termination of this Agreement, in the sum equal to the product of the number of years remaining in the term of this Agreement (prorated for any period of less than a year) multiplied by an amount equal lo thirty percent (30%) of the arithmetical average of the Continuing Fees earned per year (even if not paid) pursuant to Sections 5.1, 6.1 and 6.4 hereof over the two (2) year period ending with the last day of the month preceding the termination date (or, if the Franchise Location was not open throughout such two (2) year period, then thirty percent (30%) of the arithmetical average of such Continuing Fees earned per year - i.e. annualized - during the period in which the Franchised Location was open).

*Example:*      If three years of the initial term of this Agreement remain, and if the Franchisee owed the Franchisor six thousand dollars ($6,000) and four thousand dollars ($4,000) for Continuing Fees respectively in the two (2) years preceding the effective date of termination of this Agreement, the Franchisee would owe the Franchisor:



3 years X (.3 X ($6,000.00 + $4,000.00 / 2) * which would equal
3 X (.3 X $5,000.00) which would equal
3 X $ 1,500.00 or a total of $4,500.00

* Average Continuing Fees for 2 years.

**9.8      OTHER REMEDIES.** Nothing in this Article or this Agreement will preclude 3D BFG from seeking other damages or remedies under common law, state or federal laws or this Agreement against the FRANCHISEE including, but not limited to, attorneys' fees, punitive damages and injunctive relief.

**ARTICLE 10**

**FRANCHISEE'S TERMINATION
RIGHTS**

**10.1   GROUNDS FOR TERMINATION.** The FRANCHISEE will have the right and privilege

20

to terminate this Agreement, as provided for herein, if: (A) 3D BFG violates any material provision, term or condition of this Agreement; (B) 3D BFG fails to timely pay any material obligations due and owing to the FRANCHISEE; or (C) 3D BFG makes an assignment of its assets for the benefit of creditors.

**10.2     NOTICE OF BREACH.** The FRANCHISEE will not have the right to terminate this Agreement or to commence any arbitration proceeding, action or lawsuit against 3D BFG for breach of this Agreement, injunctive relief, violation of any federal, state or local law, violation of common law (including allegations of fraud and misrepresentation), rescission, general or punitive damages, or termination, unless and until written notice setting forth the alleged breach or violation in detail has been given to 3D BFG by the FRANCHISEE and 3D BFG fails to commence the actions necessary to correct the alleged breach or violation within thirty (30) days after having been given such written notice, or to correct the alleged breach within one hundred twenty (120) days after having been given such written notice. If 3D BFG fails to commence the actions necessary to correct the alleged breach or violation as provided herein within thirty (30) days after having been given such written notice, or to correct the alleged breach within one hundred twenty (120) days after having been given such written notice, then this Agreement may be terminated by the FRANCHISEE as provided for in this Agreement. For the purposes of this Agreement, an alleged breach of this Agreement by 3D BFG will be deemed to be "corrected" if both 3D BFG and the FRANCHISEE agree in writing that the alleged breach or violation has been corrected.

**10.3     ARBITRATION.** If 3D BFG gives notice of arbitration, as provided for in this Agreement, within thirty (30) days from the date 3D BFG was given written notice of the alleged breach from the FRANCHISEE, then the FRANCHISEE will not have the right to terminate this Agreement until the facts of the alleged breach have been submitted to arbitration, the Arbitrator determines that 3D BFG has breached this Agreement and 3D BFG fails to correct the breach within the time limitation set forth herein. If the Arbitrator determines that 3D BFG breached this Agreement as alleged by the FRANCHISEE in the written notice given to 3D BFG, then 3D BFG will have thirty (30) days from the date the Arbitrator issues a written determination on the matter to correct the specified breach of this Agreement. If 3D BFG timely corrects the specified breach of this Agreement, then this Agreement will remain in full force and effect. If 3D BFG does not correct the specified breach of this Agreement, then the FRANCHISEE will have the right to terminate this Agreement by giving 3D BFG written notice that this Agreement is terminated and, in that event, the effective date of termination of this Agreement will be the day the written notice of termination is given to 3D BFG. For the purposes of this Agreement, any controversy or dispute on the issue of whether 3D BFG has timely corrected the specified breach of this Agreement will also be subject to arbitration as provided for herein. The time limitation set forth in this Article within which 3D BFG may demand arbitration of a dispute or controversy relating to the right of the FRANCHISEE to terminate this Agreement for an alleged breach will be mandatory. If 3D BFG fails to comply with the time limitation set forth in this Article, then the FRANCHISEE may terminate this Agreement as provided for herein.

**10.4     WAIVER.** The FRANCHISEE must give 3D BFG immediate written notice of an alleged breach or violation of this Agreement after the FRANCHISEE has knowledge of, determines or is of the opinion that there has been an alleged breach or violation of this Agreement by 3D BFG. If the FRANCHISEE fails to give written notice to 3D BFG as provided for herein of an alleged breach or violation of this Agreement within one (1) year from the date that the FRANCHISEE has knowledge of, determines, is of the opinion that, or becomes aware of facts and circumstances reasonably indicating that the FRANCHISEE may have a claim under any state law, federal law or common law because there has been an alleged breach by 3D BFG, then the alleged breach or violation will be deemed to be condoned, approved and waived by the FRANCHISEE, the alleged breach or violation will not be deemed to be a breach or violation of this Agreement by 3D BFG, and the FRANCHISEE will be barred from commencing any legal or other action against 3D BFG for that alleged breach or violation.

21

**10.5** **INJUNCTIVE RELIEF AVAILABLE TO 3D BFG.** Notwithstanding any of the foregoing provisions, if the FRANCHISEE gives 3D BFG written notice of an alleged breach or violation of this Agreement, or of any laws that give rise to a claim that the FRANCHISEE has the right to terminate this Agreement, then 3D BFG will have the absolute right to immediately commence legal action against the FRANCHISEE to enjoin and prevent the termination of this Agreement without giving the FRANCHISEE any notice and without regard to any waiting period that may be contained in this Agreement. If 3D BFG commences such legal action against the FRANCHISEE, then the FRANCHISEE will not have the right to terminate this Agreement as provided for herein unless and until it has been determined that 3D BFG has breached this Agreement in the manner alleged by the FRANCHISEE, and then only if 3D BFG fails to commence the actions necessary to correct the breach or violation within thirty (30) days after a final decision has been entered against 3D BFG and all time for appeals by 3D BFG has expired. If 3D BFG commences any legal action against the FRANCHISEE as contemplated by this provision, which will include actions for injunctive relief against the FRANCHISEE to enjoin termination of this Agreement, and unless applicable law provides to the contrary, 3D BFG will not be required to post any bond or security whatever in such legal action.

## ARTICLE 11

### FRANCHISEE'S OBLIGATIONS UPON TERMINATION OR EXPIRATION

**11.1** **OBLIGATIONS UPON TERMINATION.** In the event this Agreement expires or is terminated for any reason, then the FRANCHISEE will: (A) within five (5) days after termination, pay all Continuing Fees, Advertising Fees, and other amounts due and owing to 3D BFG under this Agreement or any other contract, promissory note or other obligation-payable by the FRANCHISEE to 3D BFG; (B) return to 3D BFG by first class prepaid United States mail or personally, all Manuals, advertising materials and all other printed materials pertaining to the FRANCHISEE'S Studio 3D Brows' salon Business; and (C) comply with all other applicable provisions of this Agreement.

**11.2** **TERMINATION OF RIGHT TO USE MARKS.** Upon expiration or termination of this Agreement for any reason, the FRANCHISEE'S right to use the name Studio 3D Brows' Lashes & PMU ™, any other Marks and the Business System will terminate immediately.

**11.3** **ALTERATION OF FRANCHISED LOCATION.** If this Agreement expires or is terminated for any reason or if the Franchised Location ever ceases to be used as a Studio 3D Brows' salon Business, then the FRANCHISEE will, at its expense, alter, modify and change both the exterior and interior appearance of the Franchised Location so that it will be easily distinguished from the standard appearance of a Studio 3D Brows' salon business. At a minimum, such changes and modifications lo the Franchised Location will include: (A) repainting and, where applicable, recovering both the exterior and interior of the Franchised Location with totally different colors, including removing any distinctive colors and designs from the walls; (B) removing all fixtures and other decor items and replacing them with other decor items not of the general type and appearance customarily used only in Studio 3D Brows' salon businesses; (C) removing all exterior and interior Studio 3D Brows' Lashes & PMU signs; (D) immediately discontinuing use of the approved wall decor items and window decals; and (E) refraining from using any names, slogans, designs, decor items, colors or other items which may be confusingly similar to those customarily used only in Studio 3D Brows' salon businesses.

**11.4** **TRANSFER OF TELEPHONE DIRECTORY LISTINGS.** Upon termination or expiration of this Agreement, FRANCHISEE shall immediately notify the telephone company and/or any other applicable local carrier and all listing agencies of the termination or expiration of its right to use all telephone numbers and all classified and other directory listings for the FRANCHISEE'S Studio 3D Brows' salon Business or otherwise placed under the name Studio 3D Brows' Lashes & PMU ™, and shall direct the telephone company and/or any other applicable local carrier and all listing agencies to transfer to 3D BFG or its assignee all telephone numbers and directory listings for the FRANCHISEE'S Studio 3D Brows' salon Business. If FRANCHISEE has not transferred telephone numbers and directory

22

listings as required herein within fifteen (15) days of the date this Agreement expires or is terminated, the FRANCHISEE shall pay 3D BFG ONE HUNDRED DOLLARS ($100.00) per day for each day such transfer is not completed. The FRANCHISEE acknowledges that 3D BFG has the absolute right and interest in and to all telephone numbers and directory listings associated with the Marks, and the FRANCHISEE shall immediately direct the telephone company and/or any other applicable local carrier and all listing agencies to transfer all of the FRANCHISEE'S telephone numbers and directory listings to 3D BFG or its assignee and to perform all acts necessary to accomplish such transfers and provide 3D BFG with written evidence that such transfers have been required and accomplished if this Agreement expires or is terminated for any reason whatever. The telephone company and/or any other applicable local carrier and all listing agencies will accept this Agreement as evidence of the exclusive rights of 3D BFG to such telephone numbers and directory listings. This Agreement will constitute the FRANCHISEE'S authorization for the telephone company and/or applicable local carrier and listing agencies to transfer the telephone numbers and directory listings for the FRANCHISEE'S Studio 3D Brows' salon Business to 3D BFG, and will constitute a release of the telephone company, local carrier and listing agencies by the FRANCHISEE from any and all claims, actions and damages that the FRANCHISEE may at any time have the right to allege against them in connection with this Article 11.

## ARTICLE 12

### FRANCHISEE'S COVENANTS NOT TO COMPETE

**12.1   CONSIDERATION.**   The FRANCHISEE, the FRANCHISEE'S shareholders and the Personal Guarantors acknowledge that the FRANCHISEE, its partners or officers, and its personnel will receive specialized training, current and future marketing and advertising plans, business plans and strategies, business information and procedures, research and development information, operations information, and trade and business secrets from 3D BFG pertaining to the Business System of a Studio 3D Brows' salon business. In consideration for the use and license of such valuable and confidential information, the FRANCHISEE, the FRANCHISEE'S shareholders and the Personal Guarantors will comply in all respects with the provisions of this Article. 3D BFG has advised the FRANCHISEE that this provision is a material provision of this Agreement.

**12.2   IN-TERM COVENANT NOT TO COMPETE.**   The FRANCHISEE, the FRANCHISEE'S shareholders or members and the Personal Guarantors will not, during the term of this Agreement, on their own account or as an employee, agent, consultant, partner, officer, director or shareholder of any other person, firm, entity, partnership, limited liability company or corporation: (A) seek to employ any person who is at that time employed or contracted by 3D BFG or by any other Studio 3D Brows' Lashes & PMU ™ franchisee or business (as defined in Article 26.7 below), or induce any such employee or contractor to terminate his or her employment or contract; or (B) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest in or assist any person or entity engaged in any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to the Studio 3D Brows' salon businesses operated by 3D BFG or 3D BFG' franchisees, except other salons franchised to FRANCHISEE by 3D BFG or its subsidiaries or affiliates and with the prior written consent of 3D BFG.

**12.3   POST-TERM COVENANT NOT TO COMPETE.** The FRANCHISEE, the FRANCHISEE'S Shareholders, or members and the Personal Guarantors will not, for a period of one (1) years after the termination or expiration of this Agreement, on their own account or as an employee, contractor, agent, consultant, partner, member, officer, director or shareholder of any other person, firm, entity, partnership, limited liability company or corporation: (A) seek to employ or contract any person who is at that time employed or contracted by 3D BFG or by any other Studio 3D Brows' Lashes & PMU ™ franchisee, or induce any such employee or contractor to terminate his or her employment or contract,  or (B) own, operate, lease, franchise, conduct, engage in, be connected with, have any interest

23

in or assist any person or entity engaged in any business that is in any way competitive with (including, but not limited to, over the Internet) or similar to the Studio 3D Brows' salon businesses conducted by 3D BFG or 3D BFG' franchisees, which is located within two (2) miles of either the Franchised Location or any other Studio 3D Brows' salon businesses operated by 3D BFG or any of 3D BFG' franchisees, which is conducted on the Internet or which is located within any development area granted by 3D BFG or any affiliate or area developer of 3D BFG pursuant to any franchise, development, license or other territorial agreement. The FRANCHISEE, the FRANCHISEE'S shareholders and the Personal Guarantors expressly agree that the one (1) year period, the Internet and the two (2) mile limit are the reasonable and necessary time and distances required to protect 3D BFG and 3D BFG' franchisees if this Agreement expires or is terminated for any reason, and that this covenant not to compete is necessary to permit 3D BFG the opportunity to resell and/or develop a new Studio 3D Brows' salon business at or in the area near the Franchised Location. This post-term non-compete shall not apply to other salons franchised to FRANCHISEE by 3D BFG, its subsidiaries or affiliates.

**12.4   INJUNCTIVE RELIEF.** The FRANCHISEE, the FRANCHISEE'S shareholders and the Personal Guarantors agree that the provisions of this Article are necessary to protect the legitimate business interests of 3D BFG and 3D BFG' franchisees, including, without limitation, preventing damage to and/or loss of goodwill associated with the Marks, preventing the unauthorized dissemination of marketing, promotional and other confidential information to competitors of 3D BFG and 3D BFG' franchisees, protection of 3D BFG' trade secrets and the integrity of 3D BFG' Business System and preventing duplication of the Business System. The FRANCHISEE, the FRANCHISEE'S shareholders and the Personal Guarantors acknowledge that damages alone cannot adequately compensate 3D BFG if there is a violation of this Article by the FRANCHISEE and that injunctive relief against the FRANCHISEE is essential for the protection of 3D BFG and 3D BFG' franchisees. The FRANCHISEE, the FRANCHISEE'S shareholders and the Personal Guarantors agree therefore, that if 3D BFG alleges that the FRANCHISEE, the FRANCHISEE'S shareholders, or the Personal Guarantors have breached or violated this Article, then 3D BFG will have the right to petition a Court of competent jurisdiction for injunctive relief against the FRANCHISEE, the FRANCHISEE'S shareholders or the Personal Guarantors, in addition to all other remedies that may be available to 3D BFG at law or in equity. Unless provided to the contrary by applicable law, 3D BFG will not be required to post a bond or other security prior to obtaining injunctive relief pursuant to this Agreement in any action where 3D BFG is seeking to enjoin the FRANCHISEE, the FRANCHISEE'S shareholders or the Personal Guarantors from violating the provisions of this Article. In cases where 3D BFG is granted ex parte injunctive relief against the FRANCHISEE, the FRANCHISEE'S shareholders or the Personal Guarantors, then the FRANCHISEE, the FRANCHISEE'S shareholders and the Personal Guarantors will have the right to petition the Court for a hearing on the merits at the earliest time convenient to the Court.

**12.5   SEVERABILITY.** It is the desire and intent of the parties to this Agreement, including the FRANCHISEE'S shareholders and the Personal Guarantors, that the provisions of this Article be enforced to the fullest extent permissible under the laws and public policy applied in each jurisdiction in which enforcement is sought. Accordingly, if any part of this Article is adjudicated to be invalid or unenforceable, then this Article will be deemed to modify or delete that portion thus adjudicated to be invalid or unenforceable, such modification or deletion to apply only with respect to the operation of this Article and the particular jurisdiction in which the adjudication is made. Further, to the extent any provision of this Article is deemed unenforceable by virtue of its scope or limitation, the parties to this Agreement including the FRANCHISEE'S shareholders and the Personal Guarantors, agree that the scope and limitation provisions will, nevertheless, be enforceable to the fullest extent permissible under the laws and public policies applied in such jurisdiction where enforcement is sought.

24

## ARTICLE 13

### 3D BFG' RIGHT OF FIRST REFUSAL TO PURCHASE

**13.1     NOTICE OF PROPOSED SALE.** The FRANCHISEE will not sell, pledge, assign, trade, transfer, lease, sublease, or otherwise dispose of any interest in or any part of the FRANCHISEE'S Studio 3D Brows' salon Business or the Business Assets, as defined in this provision, without first offering the same to 3D BFG by written notice that contains all material terms and conditions of the proposed sale or transfer, including price and payment terms. "Business Assets" shall mean (A) the FRANCHISEE'S Studio 3D Brows' salon Business, (B) the Franchised Location, (C) the building or premises lease for the Franchised Location, (D) the furniture, fixtures, equipment, inventory or other assets used in the FRANCHISEE'S Studio 3D Brows' salon Business (except for the sale of any of such items in the normal course of business), (E) this Agreement, or (F) the land and building (if any) for the FRANCHISEE'S Studio 3D Brows' salon Business. Within ten (10) business days after receipt by 3D BFG of the FRANCHISEE'S written offer specifying the proposed price and terms of the proposed sale, 3D BFG will give the FRANCHISEE written notice which will either waive its right of first refusal to purchase or will state an interest in negotiating to purchase according to the proposed terms. If 3D BFG commences negotiations to purchase the FRANCHISEE'S' Business as set forth herein, then the FRANCHISEE may not sell the Business Assets to a third party for at least sixty (60) days or until 3D BFG and the FRANCHISEE agree in writing that the negotiations have terminated, whichever comes earlier. If 3D BFG waives its right to purchase, then the FRANCHISEE will have the right to complete the sale or transfer of the Business Assets according to the terms set forth in the written notice to 3D BFG; however, any such sale, transfer or assignment to a third party is expressly subject to the terms and conditions set forth in Article 20 of this Agreement. If the FRANCHISEE does not consummate the sale to a third party upon the terms and conditions previously presented to 3D BFG in writing, but negotiates a sale price with a third party that is lower or on different terms than the stated price or terms presented to 3D BFG, then the modified offer must be re-communicated or made to 3D BFG by the FRANCHISEE. 3D BFG will give the FRANCHISEE written notice within fifteen (15) business days thereafter which will state whether or not it is interested in purchasing the Business Assets according to the proposed new terms. This provision will not apply to the assignment or pledge of any of the Business Assets (with the exception of this Agreement) by the FRANCHISEE to a bank, financial institution or other lender in connection with providing financing for the leasehold improvements, furniture, fixtures, supplies, inventory and equipment used in, or operating funds for, the FRANCHISEE'S Studio 3D Brows' salon Business.

**13.2     COMPLIANCE WITH AGREEMENT.** The FRANCHISEE'S obligations under this Agreement including, but not limited to, its obligations to pay the Continuing Fees, the Advertising Fees and to operate as a Studio 3D Brows' salon Business, will in no way be affected or changed because of 3D BFG' non acceptance of the FRANCHISEE'S written offer to purchase the FRANCHISEE'S Business or assets, and, as a consequence, the terms and conditions of this Agreement will remain in full force and effect. 3D BFG' decision not to exercise the rights granted to it pursuant to this Article will not, in any way, be deemed to grant the FRANCHISEE the right to terminate this Agreement and will not affect the term of this Agreement. Moreover, if 3D BFG does not exercise the rights granted to it pursuant to this Article and if the FRANCHISEE complies with Article 20 and sells or otherwise disposes of its Business or assets to a third party, then both the FRANCHISEE and the third party purchaser will be required to comply in all respects with the terms and conditions of this Agreement, and the sale of the Business or assets will not relieve the FRANCHISEE of its obligations under this Agreement. Any sale, transfer or assignment of the Business or assets of the FRANCHISEE'S Studio 3D Brows' salon Business that does not include assignment of this Agreement to the transferee will constitute a wrongful termination of this Agreement.

**13.3     TRANSFER OF AGREEMENT TO CONTROLLED ENTITY.** If the FRANCHISEE is

25

an individual or partnership, then the FRANCHISEE will have the right to assign and transfer this Agreement to a corporation, limited liability company, partnership or other entity in which the FRANCHISEE owns and controls at least fifty-one percent (51%) of the entity's issued and outstanding capital shares, membership interests, partnership interests or ownership interests ("Ownership Interests") pursuant to Article 20.2 of this Agreement. If the FRANCHISEE transfers this Agreement to an entity owned or controlled by the FRANCHISEE pursuant to Article 20.2, which will not excuse or release the FRANCHISEE from any obligations under this Agreement, then the Ownership Interests of the FRANCHISEE'S entity may not be sold, pledged, assigned, traded, transferred or otherwise disposed of by the FRANCHISEE until the Ownership Interests have been first offered to 3D BFG in writing under the same terms and conditions offered to any third party as provided for in Article 13.1

**13-4    SALE OF OWNERSHIP INTEREST IN FRANCHISEE.**   If the FRANCHISEE is a corporation, limited liability company, partnership or other entity, then the Ownership Interests in the FRANCHISEE may not be sold, pledged, assigned, traded, transferred or otherwise disposed of by the holders thereof until the Ownership Interests have been first offered to 3D BFG in writing under the same terms and conditions applicable as if Business Assets were proposed to be sold under Article 13.1. above. Notwithstanding the terms of this Article, a holder of Ownership Interests may bequeath, sell, assign, trade or transfer Ownership Interests, without first offering them to 3D BFG, (a) to the other holders of the Ownership Interests because of the death or permanent disability of such holder or (b) to a spouse or child of the holder; provided, however, that each proposed transferee of an Ownership Interest who will be involved in the operations or management of the Studio 3D Brows' salon Business has successfully completed 3D BFG' orientation training program and has been certified by 3D BFG and is, in 3D BFG' reasonable judgment, qualified from a managerial and financial standpoint to operate the Studio 3D Brows' salon Business in an economic and businesslike manner. The FRANCHISEE and the holders of an Ownership Interest must provide 3D BFG with written notice of all such transactions, and the proposed transferee holder of an Ownership Interest must agree to be personally liable under this Agreement and enter into a written agreement where they agree to perform all the terms and conditions contained in this Agreement. All certificates representing Ownership Interests issued by the FRANCHISEE to its owners must bear the following legend;

> The ownership interests represented by this certificate are subject to a written Franchise Agreement which grants Franchisor, the right of first refusal to purchase these interests from the holder. Any person acquiring the ownership interests represented by this certificate will be subject to the terms and conditions of the Franchise Agreement between the company named on the face of this certificate and Franchisor, which includes provisions containing covenants not to compete that apply to all holders of ownership interests in the company.

**13.5    ACKNOWLEDGMENT OF RESTRICTIONS.** The FRANCHISEE acknowledges and agrees that the restrictions on transfer imposed herein are reasonable and are necessary lo protect the Studio 3D Brows' salon Business System and the Marks, as well as 3D BFG' reputation and image, and are for the protection of 3D BFG, the FRANCHISEE and all other Franchisees who own and operate Studio 3D Brows' salon businesses. Any assignment or transfer permitted by Article 13 will not be effective until 3D BFG receives a completely executed copy of all transfer documents and 3D BFG consents to the transfer in writing.

**13.6    SELLING HOLDERS SUBJECT TO COVENANT NOT TO COMPETE.**   Any holder of Ownership Interests in the FRANCHISEE that sells or assigns any Ownership Interests in the FRANCHISEE will continue to be subject to provisions of Article 12 of this Agreement after the sale or assignment.

**13.7    RIGHT OF 3D BFG TO PURCHASE FRANCHISE ASSETS.** If this Agreement expires or is terminated by either 3D BFG or the FRANCHISEE for any reason whatsoever, or if the FRANCHISEE wrongfully terminates this Agreement by failing to comply with Article 10 or otherwise, or

if the FRANCHISEE at any time ceases to do business at the Franchised Location as a Studio 3D Brows' salon Business, then 3D BFG will have the right, but not the obligation, to purchase the then-usable furniture, supplies, inventory, fixtures and equipment, and all other assets that are required by 3D BFG for a standard Studio 3D Brows' salon business and owned by the FRANCHISEE in its Studio 3D Brows' salon Business (the "Franchise Assets"). 3D BFG will not purchase any assets from the FRANCHISEE that are not part of the standard Studio 3D Brows' salon business. The FRANCHISEE must give 3D BFG written notice listing the cost of each one of the Franchise Assets in detail and the FRANCHISEE'S asking price for the Franchise Assets within four (4) business days after the FRANCHISEE ceases to do business as a Studio 3D Brows' salon Business, or after this Agreement expires or is terminated by either party, or is wrongfully terminated by the FRANCHISEE.

**13.8** **DETERMINATION OF FAIR MARKET VALUE.** If the FRANCHISEE fails to give 3D BFG written notice of the asking price of the Franchise Assets, or if 3D BFG and the FRANCHISEE cannot agree on the price of the Franchise Assets, then either party will have the right to demand that the price of the Franchise Assets be determined by arbitration in accordance with state law (for example, for Florida Franchises pursuant to the Florida Arbitration Code) or, alternately, pursuant to the Rules and Regulations of the American Arbitration Association. The arbitration hearing will be held as soon as possible, but in no event later than seven (7) business days from the date arbitration is demanded by either party. The Arbitrator will determine the fair market value of the Franchise Assets. The Arbitrator will not consider any value for goodwill associated with the name Studio 3D Brows' Lashes & PMU ™ or for going concern value in determining the fair market value of the Franchise Assets since the right of purchase granted to 3D BFG pursuant to this provision applies only after this Agreement has expired or has been terminated, or the FRANCHISEE has ceased doing business. Furthermore, the Arbitrator will not consider any value for the Lease for the Franchised Location if 3D BFG agrees to assume the Lease and pay the rental and operating costs. If the Arbitrator is unable to determine the fair market value of any of the Franchise Assets, then they will be valued at book value (cost less depreciation), 3D BFG will have the right, but not the obligation, to purchase any or all of the Franchise Assets from the FRANCHISEE for cash within fifteen (15) business days after the fair market value of the Franchise Assets has been established by the Arbitrator in writing. Nothing in this Article will prohibit 3D BFG from enforcing the terms and conditions of this Agreement, including the covenants not to compete contained in Article 12.

## ARTICLE 14

### TRAINING PROGRAM: PRE-OPENING ASSISTANCE; OPENING ASSISTANCE

**14.1** **ORIENTATION TRAINING PROGRAM.** 3D BFG will provide a mandatory orientation training program for the FRANCHISEE (and the FRANCHISEE'S manager or District Manager (if one is employed) in Miami-Dade County, Florida to educate, familiarize and acquaint them with the operations of an Studio 3D Brows' salon Business. The training program will include classroom instruction for not less than four (4) days on orientation to the Business System and basic operating skills such as daily operational procedures, inventory control, computerized point of sale system, employee or staff relations, scheduling and other topics selected by 3D BFG. The FRANCHISEE and the FRANCHISEE'S District Manager must successfully complete the orientation training program either (a) prior to commencing any business operations or (b) at the first scheduling of the orientation training program by 3D BFG after the execution of this Agreement. The orientation training program with be scheduled by 3D BFG. In the event the FRANCHISEE or its District Manager fails to successfully complete 3D BFG' orientation training program within the time period expressed in the third sentence of this Article 14. 1, he or she will not be permitted or authorized to manage or operate the FRANCHISEE'S Studio 3D Brows' salon Business and 3D BFG will have the right to reject the FRANCHISEE pursuant to Article 4.2 of this Agreement.

**14.2** **HIRING OF NEW MANAGER OR DISTRICT MANAGER.** In the event the

FRANCHISEE hires a Manager or District Manager who has not successfully completed the training program(s) prescribed by 3D BFG, and if 3D BFG determines that the new Manager does not have sufficient knowledge or experience relating to the management of the FRANCHISEE'S Studio 3D Brows' salon Business, then 3D BFG will require the individual to successfully complete the prescribed training prior to the time he or she will be allowed to manage or operate the FRANCHISEE'S Studio 3D Brows' salon Business, and the FRANCHISEE will be required to pay 3D BFG the then current training fee charged by 3D BFG.

**14.3  PAYMENT OF SALARIES AND EXPENSES DURING TRAINING.** The FRANCHISEE will pay (if applicable), the salaries, fringe benefits, payroll taxes, unemployment compensation, workers' compensation insurance, lodging, food, automobile rental, travel costs, and all other expenses for the FRANCHISEE, the FRANCHISEE'S Manager and all other persons sent to the training program by the FRANCHISEE, and the FRANCHISEE will comply with all applicable state and federal laws pertaining to all employees or contractors who attend 3D BFG' training program.

**14.4  INITIAL TRAINING.** 3D BFG shall provide to the staff of the Studio 3D Brows' salon Business, at a location selected by 3D BFG, and to any persons subsequently hired or promoted or transferred to such positions, as needed in 3D BFG' discretion, an initial training program lasting approximately five (5) to seven (7) days (more or less, in 3D BFG' discretion depending upon the experience and aptitude of the individual trainee) appropriate to the respective positions, in the operation of the Studio 3D Brows' salon Business. For such training, the FRANCHISEE shall pay to 3D BFG an initial training fee of TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00) for a maximum of 6 persons. A fee of $500.00 will be charged for each additional person. During the term of the contract, all new hiring will need to receive and pass the 3D BFG training. The employee or contractor with the Franchisee shall specify that taking and approving the training with 3D BFG is requisite for a new hiring.

**ARTICLE 15**

**3D BFG' OTHER OBLIGATIONS**

**15.1  ADDITIONAL ASSISTANCE.** Consistent with 3D BFG' uniform or dress code requirements and quality standards, 3D BFG will, at its expense: (A) provide the FRANCHISEE with a written schedule of all furniture, fixtures, supplies and equipment necessary and required for the operation of the FRANCHISEE'S Studio 3D Brows' salon Business; (B) furnish a list of approved sources from whom the FRANCHISEE can purchase furniture, fixtures, equipment, supplies, toiletries, grooming aids, products, printed materials, items, goods and services; (C) review and evaluate the FRANCHISEE'S Business as often as 3D BFG deems necessary and render written reports to the FRANCHISEE as deemed appropriate by 3D BFG; (D) protect, police and, when appropriate, enforce the Marks and the Business System for the benefit of all Studio 3D Brows franchisees; (E) render advisory services pertaining to customer service and the operation of the FRANCHISEE'S Studio 3D Brows' salon Business as frequently as 3D BFG deems appropriate; (F) provide the FRANCHISEE with 3D BFG' standard Operations Manual and all supplements and modifications to the Manual; and (G) provide the FRANCHISEE with 3D BFG' approved standard store layouts and interior preliminary plans for the Franchised Location.

**15.2  ANNUAL CONVENTION & SPECIAL EVENTS.** 3D BFG will at its discretion, during the term of this Agreement, conduct an annual convention for all Studio 3D Brows' franchisees at such times and at such locations as 3D BFG deems appropriate. The FRANCHISEE will attend the annual convention conducted by 3D BFG for Studio 3D Brows' salon franchisees during each year of this Agreement. All expenses incurred by the FRANCHISEE or any employees or contractors of the FRANCHISEE in traveling to and attending the annual convention conducted by 3D BFG will be paid for by the FRANCHISEE. 3D BFG will charge, and the FRANCHISEE will pay, a registration fee for the annual convention, regardless of whether the FRANCHISEE, or any representative of the

28

FRANCHISEE, attends the convention, and an additional registration fee will be charged for each person in addition to the first person attending the annual convention on behalf of the FRANCHISEE.

From time to time, 3D BFG will participate in special events related to the industry with the purpose of promoting it's brand and franchise. It is 3D Brows Business style to present various events related to the beauty business, such as beauty shows, modeling events and others where 3D BFG participate as cosmetic and beauty assistance. When any of these events are in schedule, 3D BFG will post a notice indicating that it will require a given cosmetologist from a given saloon or franchise to participate in such event. When contracting its staff, Franchisee will require its hired staff to participate in any of these events when requested by the Franchisor. If any cost is involved, it will be covered by both Franchisor and Franchisee, and Franchisee and the cosmetologist will receive publicity and recognition as the consideration for such participation.

**15.3    OPTIONAL ADDITIONAL TRAINING.** 3D BFG may, during the term of this Agreement, provide optional additional training and instruction to the FRANCHISEE on topics determined by 3D BFG. 3D BFG reserves the right to add or delete additional training topics at any time without notice to the FRANCHISEE. The FRANCHISEE will be required to pay 3D BFG the then-current training fee charged by 3D BFG for any additional training attended by the FRANCHISEE or its employees. All expenses incurred by the FRANCHISEE or any employees of the FRANCHISEE in traveling to and attending optional additional training will be paid for by the FRANCHISEE. All fees charged will reasonably calculated to cover the expenses incurred.

## ARTICLE 16

### 3D BFG SIGN

*CL*

**16.1    INSTALLATION OF SIGN.** The FRANCHISEE will, at its expense, purchase the standard Studio 3D Brows Sign (the "Sign") which must be displayed at the Franchised Location. The FRANCHISEE will pay for all costs incurred in connection with the erection and installation of the Sign. The Sign must conform exactly to 3D BFG' standard Sign plans and specifications and must be installed at the Franchised Location precisely in the place, location and manner specified by 3D BFG in writing. 3D BFG will have the absolute right to inspect, examine, videotape and photograph the Sign at any time during the term of this Agreement. During the franchise term, Franchisor may display a sign within Franchise premises promoting its franchise offering as per paragraph 22.8 below.

**16.2    ADDITIONAL EXPENSES.** The FRANCHISEE will, at its expense, be responsible for any and all penalties, licenses, repairs, maintenance, utilities, insurance, taxes, assessments and levies in connection with the installation or use of the Sign.

**16.3    MODIFICATION AND REPLACEMENT.** The FRANCHISEE may not alter, remove, change, modify or redesign the Sign unless approved by 3D BFG in writing. 3D BFG will have the unequivocal and unilateral right to redesign the Sign plans and specifications during the term of this Agreement without the approval or consent of the FRANCHISEE. Upon written notice from 3D BFG, the FRANCHISEE will, at its expense, either modify or replace the Sign within thirty (30) days so that the Sign displayed at the Franchise Location will comply with 3D BFG' redesigned Sign plans and specifications. The FRANCHISEE will not be required to modify or replace the Sign more than once every five (5) years during the term of this Agreement.

**16.4    1NJUNCTIVE RELIEF.** The FRANCHISEE agrees that 3D BFG will be entitled to seek injunctive relief against the FRANCHISEE to require the FRANCHISEE, at the FRANCHISEE'S expense, to: (A) exhibit the approved Studio 3D Brows Sign at the Franchised Location during the term of

this Agreement; (B) remove the Sign upon the termination or expiration of this Agreement; or (C) remove the Sign from the former franchised location upon the relocation of the Franchised Location. Unless required by applicable law, 3D BFG will not be required to post a bond or other security prior lo obtaining injunctive relief pursuant to this Article.

**ARTICLE 17**

**<u>INSURANCE</u>**

**17.1    <u>GENERAL LIABILITY</u>.**  The FRANCHISEE must acquire and maintain in full force and effect, at its sole cost and expense, a general liability insurance policy insuring the FRANCHISEE, 3D BFG, its parent, subsidiaries and affiliates, and their respective officers, directors and employees from and against any loss, liability, damage, claim or expense of any kind whatsoever including claims for bodily injury, personal injury, death, property damage, products liability and malpractice resulting from the condition, operation, use, business or occupancy of the FRANCHISEE'S Studio 3D Brows' salon Business, including the surrounding premises, the parking area and the sidewalks of the Franchised Location.

**17.2    <u>AUTOMOBILE</u>.**  The FRANCHISEE must acquire and maintain in full force and effect, at its sole cost and expense, automobile liability coverage insuring the FRANCHISEE, 3D BFG, its parent, subsidiaries and affiliates, and their respective officers, directors and employees from any and all loss, liability, damage, claim or expense of any kind whatsoever resulting from the use, operation or maintenance of any owned, leased, hired and non-owned automobile or vehicle used by the FRANCHISEE or any of its employees in connection with the FRANCHISEE'S Studio 3D Brows' salon Business.

**17.3    <u>COVERAGE LIMITS</u>.**  Liability coverage for both the general liability insurance coverage and automobile coverage must have limits of at least One Million Dollars ($1,000,000) for each person and Two Million Dollars ($2,000,000) for each occurrence, or such other limits as 3D BFG may require. Umbrella and/or excess liability policies used to comply with general liability and/or automobile liability limits shown above shall be warranted to be in excess of limits provided by primary general liability, automobile and employers liability.

**17.4    <u>PROPERTY INSURANCE</u>.**  The FRANCHISEE will maintain in full force and effect, at its sole cost and expense, "all risks" property insurance coverage for the equipment, furnishings, fixtures, inventory and signs owned or leased by the FRANCHISEE and used at the Franchised Location (including fire and extended coverage) with limits equal to at least "replacement" cost. There shall be no co-insurance penalty imposed by such coverage. 3D BFG shall be named as a loss payee on such policy as "franchisor's interests may appear."

**17.5    <u>PROFESSIONAL LIABILITY INSURANCE</u>.**  The FRANCHISEE will maintain in full force and effect, at its sole cost and expense, professional liability coverage with coverage limits of at least Two Million Dollars ($2,000,000) insuring the FRANCHISEE, 3D BFG, and their respective officers, directors and employees from any and all loss, liability, damage, claim or expense of any kind whatsoever resulting from actions or omissions of the FRANCHISEE'S officers, directors or any of its employees in connection with the FRANCHISEE'S Studio 3D Brows' salon Business.

**17.6    <u>OTHER INSURANCE</u>.**  The FRANCHISEE will, at its sole cost and expense, procure and pay for all other insurance required by state or federal law, including workers' compensation insurance or its equivalent for its employees, employer's liability insurance, together with all insurance required under any lease, mortgage, deed of trust or other legal contract in connection with the Franchised Location or the operation of the FRANCHISEE'S Studio 3D Brows' salon Business.

**17.7    <u>INSURANCE COMPANIES: EVIDENCE OF COVERAGE</u>.**  All insurance companies

30

providing coverage to the FRANCHISEE must have an A.M. Best Rating of at least "A" and be licensed and/or authorized to do business in the state where coverage is provided. Before construction or remodeling of the Franchised Business begins, the FRANCHISEE will provide 3D BFG with certificates of insurance evidencing the required insurance coverage no later than the date the FRANCHISEE takes possession of the Franchised Location and will provide, immediately upon expiration, change or cancellation, new certificates of insurance to 3D BFG. General conditions applying to all insurance coverage are that: 1) no policy shall contain a self-insured retention; 2) no policy shall contain a deductible in excess of $5,000; and 3) satisfaction of any and all deductibles shall be the sole responsibility of FRANCHISEE. In the event of a breach of the insurance procurement obligations by the FRANCHISEE, it must pay for 3D BFG attorneys' fees, expenses and liability as a result of any claim or lawsuit.

**17.8    3D BFG's RIGHTS.** All insurance policies procured and maintained by the FRANCHISEE pursuant to this Article will name 3D BFG, its parent, subsidiaries and affiliates as additional insured, will contain endorsements by the insurance companies waiving all rights of subrogation against 3D BFG, its parent, subsidiaries and affiliates and will stipulate that 3D BFG will receive copies of all notices of cancellation, non-renewal, or coverage reduction or elimination at least thirty (30) days prior to the effective date of such cancellation, non-renewal or coverage change. FRANCHISEE agrees to immediately provide 3D BFG with any such notification received from the insurance carrier.

**17.9    DEFENSE OF CLAIMS.**    All liability insurance policies procured and maintained by the FRANCHISEE will require the insurance companies to provide and pay for legal counsel to defend any legal actions, lawsuits or claims brought against the FRANCHISEE, 3D BFG, its parent, subsidiaries and affiliates and their respective officers, directors and employees.

**17.10   NO REPRESENTATIONS; RIGHT TO ADDITIONAL COVERAGE.**   3D BFG makes no representations with respect to the   adequacy of the types of insurance coverage or coverage amounts set forth herein, and the   FRANCHISEE   will have the absolute right to maintain additional types of coverage and higher coverage amounts than those specified herein as minimum requirements.



**ARTICLE 18**

**INDEPENDENT CONTRACTORS; INDEMNIFICATION**

**18.1    INDEPENDENT CONTRACTORS.** 3D BFG and the FRANCHISEE are each independent contractors and, as a consequence, there is no employer-employee or principal-agent relationship between 3D BFG and the FRANCHISEE. The FRANCHISEE will not have the right to and will not make any agreements, representations or warranties in the name of or on behalf of 3D BFG or represent that their relationship is other than that of Franchisor and Franchisee. Neither 3D BFG nor the FRANCHISEE will be obligated by or have any liability to the other under any agreements or representations made by the other to any third parties.

**18.2    INDEMNIFICATION.** Neither 3D BFG nor its parent, subsidiaries and/or affiliates will be obligated to any person or entity for damages arising out of, from, in connection with, or as a result of the FRANCHISEE'S negligence or the operation of the FRANCHISEE'S Studio 3D Brows' salon Business. The FRANCHISEE will defend, indemnify and hold 3D BFG, its parent, affiliates and subsidiaries and their respective officers, directors, employees and agents harmless against all claims, lawsuits, damages, obligations, liability, actions and judgments alleged or obtained by any person or entity against 3D BFG, its parent, affiliates or subsidiaries arising out of, from, as a result of, or in connection with the FRANCHISEE'S negligence, the operation of the FRANCHISEE'S Studio 3D Brows' salon Business, the Franchised Location, or any business conducted by the FRANCHISEE

31

pursuant to this Agreement, including, without limitation, any claims arising from or relating to: (A) any personal injury, property damage, commercial loss or environmental contamination resulting from any act or omission of the FRANCHISEE or its employees, agents or representatives; (B) any failure on the part of the FRANCHISEE to comply with any requirement of any governmental authority; (C) any failure of the FRANCHISEE to pay any of its obligations; or (D) any failure of the FRANCHISEE to comply with any requirement or condition of this Agreement or any other agreement with 3D BFG or any parent, affiliate or subsidiary of 3D BFG. Further, the FRANCHISEE will indemnify and reimburse 3D BFG, its parent, subsidiaries and affiliates and their respective officers, directors, employees and agents for all such obligations and damages for which 3D BFG is held liable and for all costs reasonably incurred by 3D BFG in the defense of any such claims brought against it or in any action in which it is named as a party including, without limitation, costs for attorneys' fees actually incurred, investigation expenses, court costs, deposition expenses and travel and living expenses. 3D BFG, its parent, subsidiaries and affiliates will have the absolute right to defend any claim made against any one of them, as the case may be that results from or arises out of the FRANCHISEE'S Studio 3D Brows' salon Business.

**18.3** **PAYMENT OF COSTS AND EXPENSES.** The FRANCHISEE will pay all costs and expenses, including attorneys' fees, actually incurred by 3D BFG in enforcing any term, condition or provision of this Agreement or in seeking to enjoin any violation of this Agreement by the FRANCHISEE.

**18.4** **CONTINUATION OF OBLIGATIONS.** The indemnification and other obligations contained in this Article will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.



### ARTICLE 19

### FINANCIAL STATEMENTS: GROSS REVENUE REPORTS: FORMS AND ACCOUNTING

**19.1** **QUARTERLY AND ANNUAL FINANCIAL STATEMENTS.** The FRANCHISEE will, at its expense, provide 3D BFG with a quarterly balance sheet and income statement, and annual financial statements for the FRANCHISEE'S Studio 3D Brows' salon Business which will consist of a balance sheet, income statement, statement of cash flows and explanatory footnotes. All financial statements provided to 3D BFG for the FRANCHISEE'S Studio 3D Brows' salon Business will be presented in the exact form and format prescribed by 3D BFG in writing and will be categorized according to the chart of accounts prescribed by' 3D BFG. The FRANCHISEE'S financial statements will be prepared in accordance with generally accepted accounting principles applied on a consistent basis. If the FRANCHISEE'S annual Financial statements are not audited by an independent certified public accountant, then the FRANCHISEE'S annual financial statements must be certified in writing as accurate by the FRANCHISEE'S President or Chief Financial Officer, or if the FRANCHISEE is not a corporation, then by the FRANCHISEE'S Managing Partner, Chief Operating Officer or Chief Financial Officer. The FRANCHISEE'S quarterly financial statements will be delivered to 3D BFG by the FRANCHISEE within thirty (30) days after the end of the quarter and the annual financial statements will be delivered within ninety (90) days of the FRANCHISEE'S fiscal year end.

**19.2** **TAX RETURNS.** Within ninety (90) days after the FRANCHISEE'S fiscal year end, the FRANCHISEE will furnish 3D BFG with signed copies of the FRANCHISEE'S annual federal, and if applicable, state income tax returns, and copies of any other federal, state or local tax returns filed by the FRANCHISEE including, but not limited to, any amended tax returns filed by the FRANCHISEE, together with proof that the FRANCHISEE has paid all federal and state income and sales taxes due.

32

**19.3 MONTHLY STATEMENT OF GROSS REVENUES.** The FRANCHISEE will maintain an accurate written record of daily Gross Revenues for the FRANCHISEE'S Studio 3D Brows' salon Business and the FRANCHISEE will remit an electronic or written statement of the monthly Gross Revenues generated by, at, as a result of, or from the FRANCHISEE'S Studio 3D Brows' salon Business using such forms as 3D BFG may prescribe in writing. The statement must be signed and certified as accurate by the FRANCHISEE. The monthly statement of Gross Revenues will accompany the FRANCHISEE'S monthly Continuing Fees and Advertising Fees and will be provided to 3D BFG on or before the fifth business day of each new month. If FRANCHISEE fails to submit such report on a timely basis, then 3D BFG shall have the right to impose a penalty of $50.00 per week until the report is received.

**19.4 3D BFG' AUDIT RIGHTS.** Within three (3) days after having been given written notice from 3D BFG, the FRANCHISEE and its accountants will make all of their books, ledgers, work papers, accounts, bank statements, tax returns, sales tax returns, daily cash register tapes and financial records pertaining to the FRANCHISEE'S Business ("books and financial records") available to 3D BFG during all business hours for review and audit by 3D BFG or its designee. The books and financial records for each fiscal year will be kept in a secure place by the FRANCHISEE and will be available for audit by 3D BFG for at least the preceding five (5) years. The FRANCHISEE will provide 3D BFG with adequate facilities to conduct the audit, including a working area with a desk and chair at either the Franchised Location or at the FRANCHISEE'S accountants' offices. The FRANCHISEE'S failure or refusal to produce the books and financial records for audit by 3D BFG in accordance with this Article 19.4 will constitute a material breach of this Agreement and will be grounds for the immediate termination of this Agreement by 3D BFG.

**19.5 WAIVER BY FRANCHISEE.** 3D BFG will have the right, without notice to, or further approval of or authorization by the FRANCHISEE, to obtain credit reports maintained by credit reporting agencies regarding the FRANCHISEE and the right to review the books and records maintained by the vendors or suppliers that supply products, goods or services to the FRANCHISEE regarding the purchases made by the FRANCHISEE. This Agreement will serve as evidence of 3D BFG' right to review such information and will constitute the authority from the FRANCHISEE for credit reporting agencies, vendors and suppliers to provide such information to 3D BFG.

**19.6 PAYMENT BY PRE-AUTHORIZED BANK TRANSFER.** The FRANCHISEE will execute an authorization for direct payment in the form attached hereto as Exhibit "2" and will, from time to time during the term of this Agreement, execute such other documents as 3D BFG may request to provide the FRANCHISEE'S unconditional and irrevocable authority and direction to its bank or financial institution authorizing and directing the FRANCHISEE'S bank or financial institution to pay and deposit directly to the account of 3D BFG, and to charge to the account of the FRANCHISEE, on the fifth business day of each month, the amount of the Continuing Fees, Advertising Fees and other sums due and payable by the FRANCHISEE pursuant to this Agreement in accordance with Article 5 and Article 6 of this Agreement. The FRANCHISEE'S authorizations will permit 3D BFG to designate the amount to be debited or drafted from the FRANCHISEE'S account and to adjust such amount from time to time, to the amount of the Continuing Fees, Advertising Fees and other sums then payable to 3D BFG from the FRANCHISEE. The FRANCHISEE will, at all times during the term of this Agreement, maintain a balance in its account at its bank or financial institution sufficient to allow the appropriate amount to be debited from the FRANCHISEE'S account for payment of the Continuing Fees, Advertising Fees and other sums payable by the FRANCHISEE for deposit in the account of 3D BFG.

# ARTICLE 20

## ASSIGNMENT

**20.1     ASSIGNMENT BY 3D BFG.** This Agreement may be immediately assigned and transferred by 3D BFG without the FRANCHISEE'S approval or consent, and will inure to the benefit of 3D BFG' successors and assigns. 3D BFG will provide the FRANCHISEE with written notice of any such assignment or transfer, and the assignee will be required to fulfill 3D BFG' obligations under this Agreement.

**20.2     ASSIGNMENT BY FRANCHISEE TO CONTROLLED ENTITY.** In the event The FRANCHISEE is an individual or a partnership, this Agreement may be transferred or assigned by the FRANCHISEE, without first offering it to 3D BFG pursuant to Article 13, to a corporation, limited liability company, partnership or other entity which is owned or controlled (ownership of at least fifty-one percent (51%) of the outstanding ownership interests) by the FRANCHISEE, provided that: (A) (he FRANCHISEE and all the holders of the ownership interests of the assignee entity sign or have signed a personal guaranty in the form attached to this Agreement; (B) the FRANCHISEE furnishes prior written proof to 3D BFG substantiating that the assignee entity will be financially able to perform all of the terms and conditions of this Agreement; and (C) none of the holders of ownership interests in the entity owns, operates, franchises, develops, manages or controls any business that is in any way competitive with or similar to a Studio 3D Brows' salon business. The FRANCHISEE will give 3D BFG fifteen (15) days written notice prior to the proposed date of assignment or transfer of this Agreement to an entity owned or controlled by the FRANCHISEE; however, the transfer or assignment of this Agreement will not be valid or effective until 3D BFG has received the legal documents which  its legal counsel deems necessary to properly and legally document the transfer or assignment of this Agreement to the entity as provided herein.

**20.3     ASSIGNMENT UPON DEATH OR DISABILITY OF INDIVIDUAL FRANCHISEE.** If *CL* the FRANCHISEE is an individual, then this Agreement may be assigned, transferred or bequeathed by the FRANCHISEE to any designated person or beneficiary without first being offered to 3D BFG pursuant to Article 13 upon his or her death or permanent disability. However, the assignment of this Agreement to the transferee, assignee or beneficiary of the FRANCHISEE will not be valid or effective until 3D BFG has received the properly executed legal documents which its legal counsel deems necessary to properly and legally document the transfer, assignment or bequest of this Agreement, and until the transferee, assignee or beneficiary agrees to be unconditionally bound by the terms and conditions of this Agreement and to personally guarantee the performance of the FRANCHISEE'S obligations under this Agreement.

**20.4     APPROVAL OF TRANSFER; CONDITIONS FOR APPROVAL.** The rights granted to the FRANCHISEE pursuant to this Agreement may be assigned or transferred by the FRANCHISEE only with the prior written approval of 3D BFG. 3D BFG will not unreasonably withhold its consent to any transfer of this Agreement provided that the FRANCHISEE and the transferee Franchisee comply with the following conditions: (A) the FRANCHISEE has complied in all respects with Article 13 of this Agreement; (B) all of the FRANCHISEE'S monetary obligations due to 3D BFG have been paid in full, and the FRANCHISEE is not otherwise in default under this Agreement; (C) the FRANCHISEE has executed a written agreement in a form satisfactory to 3D BFG in which the FRANCHISEE agrees to observe all applicable obligations and covenants contained in this Agreement; (D) the transferee Franchisee and the holders of its ownership interests agree to be personally liable to discharge all of the FRANCHISEE'S obligations under this Agreement, and will enter into a written agreement in a form satisfactory to 3D BFG assuming and agreeing to discharge all of the FRANCHISEE'S obligations and covenants under this Agreement; (E) the transferee Franchisee will have demonstrated to 3D BFG' satisfaction that he, she or it meets 3D BFG' managerial, financial and business standards for new Franchisees, possesses a good business reputation and credit rating, and possesses the aptitude and ability

34

to conduct the franchised business (as may be evidenced by prior related business experience or otherwise); (F) the transferee Franchisee and all parties having a legal or beneficial interest in the transferee Franchisee including, if applicable, the holders of all ownership interests in the transferee Franchisee and the Personal Guarantors of the transferee Franchisee will execute 3D BFG' then-current standard Franchise Agreement for a term ending on the expiration date of this Agreement and such other ancillary agreements as 3D BFG may require for the transfer of the FRANCHISEE'S Business; (G) the transferee Franchisee will not be required to pay the initial Fee, however, the transferee Franchisee will be required to pay the Continuing Fees and the Advertising Fees to 3D BFG at the rate specified in this Agreement; (H) the transferee Franchisee has purchased the Franchised Location or has acquired a lease for the Franchised Location for a reasonable term consistent with the remaining term of this Agreement; (I) the transferee Franchisee (and its Manager if one is employed) must successfully complete the training program(s) prescribed by 3D BFG; (J) the transferee Franchisee will pay the salaries, fringe benefits, payroll taxes, unemployment compensation, workers' compensation insurance, hotel costs, travel costs and other expenses for all persons sent to the training program(s), and will pay to 3D BFG 3D BFG' then-current training fee for each person attending 3D BFG' training program(s); (K) the FRANCHISEE has paid the transfer fee required under Article 20.6; (L) the transferee Franchisee has paid the Training Program Deposit required under Article 20.7; (M) the transferee Franchisee does not own, operate, franchise, develop, manage or control any business that is in any way competitive with or similar to a Studio 3D Brows' salon business; and (N) if the transferee Franchisee does not meet 3D BFG' net worth requirements for operation of the Studio 3D Brows' salon Business, then the FRANCHISEE and/or the holders of all ownership interests in the transferee Franchisee and the Personal Guarantors will execute a written agreement in a form satisfactory to 3D BFG agreeing to remain liable to 3D BFG for the obligations of the Studio 3D Brows' salon Business.

**20.5    ACKNOWLEDGMENT OF RESTRICTIONS.** The FRANCHISEE acknowledges and agrees that the restrictions on transfer imposed herein are reasonable and are necessary to protect the Studio 3D Brows Business System and the Marks, as well as 3D BFG' reputation and image, and are for the protection of 3D BFG, the FRANCHISEE and all other franchisees who own and operate Studio 3D Brows' salon businesses. Any assignment or transfer permitted by this Article 20 will not be effective until 3D BFG receives a completely executed copy of all transfer documents and 3D BFG consents to the transfer in writing, and any attempted assignment or transfer made without complying with the requirements of this Article 20 will be void.

**20.6    TRANSFER FEE.** If, pursuant to the terms of this Article 20, the rights granted to the FRANCHISEE in this Agreement are assigned, transferred or bequeathed to another person or entity, or if the holders of Ownership Interests in the FRANCHISEE representing more than fifty percent (50%) of the voting power in the FRANCHISEE transfer their interests in the FRANCHISEE to another person or entity, then the FRANCHISEE will pay 3D BFG a transfer fee. The amount of the transfer fee is based on the number of Studio 3D Brows' salon Businesses that the FRANCHISEE simultaneously transfers to another person or entity. The FRANCHISEE will pay 3D BFG a transfer fee of Two Thousand Five Hundred Dollars ($2,500.00) to assign the FRANCHISEE'S rights in this Agreement between the FRANCHISEE and 3D BFG, or the holders of Ownership Interests in the FRANCHISEE representing more than fifty percent (50%) of the voting power in the FRANCHISEE transfer their interests in the FRANCHISEE to another person or entity. If the FRANCHISEE simultaneously transfers its rights in this Agreement and the FRANCHISEE'S rights in any additional franchise agreements between the FRANCHISEE and 3D BFG for the operation of a Studio 3D Brows' salon Business, then the amount of the transfer fee will be reduced for each additional transfer by FIVE HUNDRED DOLLARS ($500.00) until a minimum of FIVE HUNDRED DOLLARS ($500.00) per transfer. This fee is to cover the costs incurred by 3D BFG for attorneys' fees, accountants' fees, compliance with applicable laws, out-of-pocket expenses, long distance telephone calls, and the time of its employees and officers.

**20.7    TRAINING PROGRAM DEPOSIT.** If, pursuant to the terms of this Article 20, the rights granted in this Agreement are assigned, transferred or bequeathed to another person or entity, or if the holders of Ownership Interests in the FRANCHISEE representing fifty percent (50%) of the voting

power in the FRANCHISEE transfer their interests in the FRANCHISEE to another person or entity, then, as a condition (in addition to the other conditions expressed in this Article 20) to the approval by 3D BFG of such assignment, transfer or bequest, the transferee Franchisee will pay 3D BFG a training program deposit which will be refunded to the transferee Franchisee in its entirety upon the transferee Franchisee's successful completion of 3D BFG' training program. The amount of the training program deposit to be paid to 3D BFG is TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00).

## ARTICLE 21

## SITE SELECTION: STANDARD STORE LAYOUTS AND PLANS

**21.1 SITE SELECTION.** The FRANCHISEE will be solely responsible for selecting a site for the Franchised Location, which site is subject to 3D BFG' approval. 3D BFG has strongly recommended that the FRANCHISEE should retain an experienced commercial real estate broker or salesperson ("real estate broker") who has at least three (3) years experience in locating and/or leasing retail space to locate a site for the FRANCHISEE'S Studio 3D Brows' salon Business. Accordingly, no provision of this agreement may be construed to impose any obligation or responsibility on 3D BFG to locate or select a site for the Franchised Location. The proposed site must be reviewed in writing by 3D BFG to determine accessibility, visibility, potential traffic flows and other demographic information and meet 3D BFG' approval, The review of the site conducted by 3D BFG will not be deemed to be a warranty, representation or guaranty by 3D BFG that if the FRANCHISEE'S Studio 3D Brows' salon Business is opened and operated at that site, it will be a financial success. 3D BFG will have the right to require the FRANCHISEE to obtain, at the FRANCHISEE'S expense, an economic feasibility and demographics study for the proposed site of the Franchised Location. Any feasibility and demographics study required by 3D BFG will be completed by a real estate expert mutually agreed upon by 3D BFG and the FRANCHISEE in writing.

**21.2 STANDARD STORE LAYOUTS AND PLANS.** After the Franchised Location has been identified, the FRANCHISEE will, within sixty (60) days of the date of this Agreement, provide 3D BFG with the following information for the Franchised Location: (A) the store front elevation; (B) space documentation (size and lay-out); (C) location of the plumbing and electrical sources; (D) local signage requirements, laws and regulations; and (E) all other pertinent information. Based upon the information provided by the FRANCHISEE, 3D BFG will provide approved store layouts and preliminary plans for the Franchised Location. The FRANCHISEE will construct or remodel the Franchised Location in strict compliance with the store layouts and preliminary plans provided by 3D BFG. Any unauthorized variance from the store layouts and plans prepared by 3D BFG will be a material breach of this Agreement. Providing store layouts and plans does not constitute a representation, warranty or guaranty by 3D BFG that the site will be a financially successful location for the FRANCHISEE'S Studio 3D Brows' salon Business, and the FRANCHISEE assumes all business and economic risks associated with the operation of the Studio 3D Brows' salon Business at this site. Unless prevented by factors beyond the FRANCHISEE'S reasonable control, the FRANCHISEE shall cause the construction of the Franchised Location to be completed and all equipment to be installed and be open for business within one hundred eighty (180) days of the Effective Date of this Agreement.

**21.3 INCORRECT INFORMATION.** In the event any of the information provided to 3D BFG by the FRANCHISEE pursuant to this Article is incorrect, inaccurate or incomplete, then the FRANCHISEE will pay for all costs and expenses incurred by 3D BFG in revising the store layouts and preliminary plans prepared by 3D BFG for the Franchised Location. Formal plans should be produced by Franchisee at its cost and submitted to 3D BFG for approval.

**21.4 FRANCHISEE RESPONSIBLE FOR CONSTRUCTION OR REMODELING.** The FRANCHISEE will be solely responsible for ascertaining and insuring that the Franchised Location is constructed or remodeled according to the store layouts and final plans approved by 3D BFG and is in

36

compliance with all applicable local, state and federal laws, ordinances, statutes and building codes, including compliance with the Americans with Disabilities Act. Accordingly, the FRANCHISEE or its agent will be responsible for inspecting the premises during construction or remodeling to insure that the Franchised Location compiles with the store layouts and plans and with applicable laws and ordinances.

**21.5    3D BFG's OPTION TO VIEW FRANCHISED LOCATION.** 3D BFG may, at its expense, view the Franchised Location during construction or remodeling at such times as it deems necessary for the purpose of determining the progress of the construction or remodeling and to ascertain that the interior and exterior of the Franchised Location are generally being constructed or remodeled according to the store layouts and plans. 3D BFG' viewing of the Franchised Location during construction or remodeling will not be for the purpose of determining that the Franchised Location is being constructed or remodeled in a workmanlike manner or in compliance with any applicable laws or ordinances. Accordingly, 3D BFG will have no responsibility or liability to the FRANCHISEE or any other person or entity if the Franchised Location is not constructed or remodeled according to the store layouts and plans, in a workmanlike manner or in compliance with any applicable laws or ordinances.

**ARTICLE 22**

**LEASEHOLD RIGHTS AND OBLIGATIONS**

**22.1    SUBLEASE.** In the event that 3D BFG acquire the franchise location directly from Landlord, FRANCHISEE shall sublease the Franchised Location under the terms and conditions of 3D BFG' then current lease agreement ("Sublease"), and will execute a sublease agreement in the form of Exhibit C to the Franchise Disclosure Document.

**22.2    LEASEHOLD IMPROVEMENTS.** FRANCHISEE, at FRANCHISEE'S sole expense, shall add such leasehold improvements to the subject location as may be required by 3D BFG. Said leasehold improvements shall be constructed in strict conformity with designs, plans and specifications approved in writing by 3D BFG prior to the commencement of any construction. FRANCHISEE, at FRANCHISEE'S sole expense, shall equip and furnish the subject location with such equipment, furniture, fixtures and signs as 3D BFG may reasonably require in order to ensure a uniform appearance of all 3D BFG's Studio 3D Brows' salon locations.

**22.3    FRANCHISEE TO COMPLY WITH LEASE.** FRANCHISEE agrees to comply with all terms and conditions of the lease and Sublease referred to in Section 22.1 hereof. Upon receipt of any notice of default or breach of the terms of said lease and Sublease, FRANCHISEE agrees to promptly take all reasonable steps necessary to cure said default or breach. In the event FRANCHISEE does not promptly act to cure said default or breach, 3D BFG, or its agents or employees, have the right, in addition to any other remedy available to 3D BFG under the terms and conditions of this Agreement, to take all reasonable steps necessary to cure said default or breach. FRANCHISEE shall immediately reimburse 3D BFG for any costs incurred by 3D BFG incidental to 3D BFG' cure of said default or breach, including, but not limited to, entering the subject location for the purpose of operating the Franchise.

**22.4    MAINTENANCE OF FURNITURE AND FIXTURES.** FRANCHISEE agrees at FRANCHISEE'S expense to maintain all improvements, furniture, fixtures, and equipment located in the subject location in good and safe working order and to replace all worn, damaged or unsafe improvements, furniture, fixtures and equipment with new replacement items of equal or better quality which shall conform in appearance and design to the then current approved designs and plans and specifications of 3D BFG. Subject to Section 22.2 above, in addition, 3D BFG may from time to time require FRANCHISEE to modify the appearance of the subject location to conform to the current

37

approved design and appearance standards adopted by 3D BFG. FRANCHISEE shall, within a reasonable time after notice from 3D BFG of such standards, take all steps, including remodeling or other substantial changes, necessary to comply with said standards at FRANCHISEE'S cost. In all events, FRANCHISEE shall install and use only such furnishings, fixtures and equipment as shall conform to specifications of design, color, quality, performance and utility designated or approved in writing by 3D BFG.

**22.5** **MAINTENANCE OF INTERIOR AND EXTERIOR.** FRANCHISEE shall, at FRANCHISEE'S expense, maintain the interior and exterior of the subject location in a clean, orderly, safe, and sanitary condition satisfactory to 3D BFG and shall make such repairs or modifications as are necessary to maintain an aesthetically pleasing appearance. All repairs, modifications, and remodeling of the subject location shall be made only after FRANCHISEE has received the prior written consent of 3D BFG.

**22.6** **FRANCHISEE'S INDEMNIFICATION OF 3D BFG RE: IMPROVEMENTS.** FRANCHISEE agrees to indemnify, defend, and hold 3D BFG, its parent, subsidiaries and affiliates and  their respective officers, directors, employees and agents harmless from any claim, action, proceeding or demand arising from or pertaining to FRANCHISEE'S improvements to, or modifications of, the subject location.

**22.7** **APPROVAL OF SIGNS.** FRANCHISEE shall not install or use any sign, whether on the exterior or in the interior of the subject location, which has not received the prior written approval of 3D BFG. As used herein the term "sign" shall be interpreted in its broadest sense and shall include all displays, cards, window advertising and promotional material.

**22.8** **3D BFG' RIGHT TO PLACE INQUIRY SIGNS.** 3D BFG shall have the right to place in a conspicuous location in the subject location a sign of reasonable proportions which shall advise the public that FRANCHISEE'S business is a franchise and request prospective franchisees to contact 3D BFG.

**22.9** **3D BFG' REMEDY OF FRANCHISEE'S FAILURE UNDER ARTICLE 22.** If FRANCHISEE should fail to comply with any of the terms and conditions of this Article 22, in addition to any other relief available to 3D BFG, 3D BFG or any persons authorized by 3D BFG, without liability to FRANCHISEE, shall have the right, in addition to any rights 3D BFG may have under the lease or Sublease, to enter at any time upon the subject location and perform any act deemed necessary by 3D BFG to remedy such failure and FRANCHISEE shall immediately reimburse 3D BFG for any costs incurred by 3D BFG incidental thereto.

**22.10** **3D BFG DOES NOT SERVE AS FRANCHISEE'S LEGAL COUNSEL.** At FRANCHISEE'S request, 3D BFG shall offer assistance to FRANCHISEE in selecting a site for the store and advising FRANCHISEE in negotiating an acceptable lease agreement for the site. 3D BFG shall not represent FRANCHISEE in a legal capacity and advises FRANCHISEE to seek independent legal counsel in the review and negotiation of its lease agreement. FRANCHISED EXPRESSLY ACKNOWLEDGES AND AGREES THAT 3D BFG' APPROVAL OF A SITE FOR FRANCHISEE'S STORE IS NOT AND SHALL NOT BE CONSTRUED AS A GUARANTEE OR ASSURANCE THAT THE STORE'S BUSINESS WILL BE PROFITABLE AND FRANCHISEE ASSUMES ALL RISKS.

**ARTICLE 23**

**ARBITRATION**

**23.1** **DISPUTES SUBJECT TO ARBITRATION.** Except as expressly provided to the contrary in this Agreement, all disputes and controversies between the parties, including allegations of fraud,

38

misrepresentation or violation of any state or federal laws or regulations, arising under, as a result of, or in connection with this Agreement, the Franchised Location or the FRANCHISEE'S Studio 3D Brows' salon Business will be resolved and determined exclusively by arbitration in accordance in accordance with Florida state law (Florida Arbitration Code, Florida Statutes Annotated, Chapter 682, § 682.01 et. seq.), or alternately, pursuant to the Commercial Rules and Regulations of the American Arbitration Association.

**23.2** **NOTICE OF DISPUTE.** The party alleging the breach, claim, dispute or controversy ("dispute") must give the other party written notice setting forth the alleged dispute in detail. The party who is given such written notice alleging the dispute will have thirty (30) days after having been given such written notice from the complaining party to correct or resolve the dispute specified in the written notice.

**23.3** **DEMAND FOR ARBITRATION.** If the dispute alleged by either party has not been corrected, settled or compromised within the time period provided for in this Agreement, then either party may notice arbitration by giving the other party written notice demanding arbitration. Any arbitration, or any claim in arbitration (including any defense and any claim of setoff or recoupment), must be brought or asserted before the expiration of the earlier of (1) the time period for bringing an action under any applicable state or federal statute of limitation; (2) one year after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (3) two years after the first act or omission giving rise to an alleged claim. Claims of 3D BFG attributable to the underreporting of sales and claims of the parties for indemnification shall be subject only to the applicable state or federal statute of limitation. Within ten (10) days after a written demand for arbitration has been given by the party demanding arbitration, either party will have the right to request the Court with jurisdiction, the appropriate magistrate and court officer (or, alternately, office of the American Arbitration Association) to initiate the procedures necessary to appoint an Arbitrator. The Arbitrator will be appointed within sixty (60) days after a written demand for Arbitration has been made pursuant to the Florida Arbitration Code (or, alternately, in accordance with the Rules and Regulation of the American Arbitration Association).

**23.4** **VENUE AND JURISDICTION.** All Arbitration hearings will take place exclusively in Miami-Dade County, Florida. 3D BFG and the FRANCHISEE and their officers, directors and shareholders or partners and the Personal Guarantors acknowledge that the FRANCHISEE and its officers, directors and employees have had substantial business and personal contacts with 3D BFG in Florida, do hereby agree and submit to personal jurisdiction in Florida in connection with any arbitration hearings hereunder and any suits or actions brought to enforce the decision of the Arbitrator, and do hereby waive any rights they may have to contest venue and jurisdiction in Florida and any claims that venue and jurisdiction in Florida are invalid.

**23.5** **POWERS OF ARBITRATOR.** The authority of the Arbitrator will be limited to making a finding, judgment, decision and award relating to the interpretation of or adherence to the written provisions of this Agreement. The applicable statutes of the Laws of the State of Florida (or, alternately, The Federal Rules of Evidence) will apply to all arbitration hearings and the introduction of all evidence, testimony, records, affidavits, documents and memoranda in any arbitration hearing must comply in all respects with the statutes and legal precedents in the Laws of the State of Florida. Both parties will have the absolute right to cross-examine any person who testified against them or in favor of the other party. The Arbitrator will not have the authority or right to add to, delete, amend or modify in any manner the terms, conditions and provisions of this Agreement. All findings, judgments, decisions and awards of the Arbitrator will be limited to the dispute set forth in the written demand for arbitration, and the Arbitrator will not have the authority to decide any other issues. The Arbitrator will not have the right or authority to award punitive damages to 3D BFG or the FRANCHISEE or their officers, directors, shareholders or partners and

39

Personal Guarantors, and 3D BFG and FRANCHISEE and their officers, directors, shareholders or partners, and Personal Guarantors expressly waive their rights to plead or seek punitive damages. All findings, judgments, decisions and awards by the Arbitrator will be in writing, will be made within sixty (60) days after the arbitration hearings have been completed, and will be final and binding on 3D BFG and the FRANCHISEE, except as provided for in Article 23.8. The written decision of the Arbitrator will be deemed to be an order, judgment and decree and may be entered as such in any Court of competent jurisdiction by either party.

**23.6 <u>NO COLLATERAL ESTOPPEL OR CLASS ACTIONS.</u>** Except as provided herein, all arbitration findings, conclusions, orders and awards made by the Arbitrator will be final and binding on 3D BFG and the FRANCHISEE and their officers, directors, shareholders or partners, and Personal Guarantors; however, such Arbitration findings, conclusions, orders and awards may not be used to collaterally stop either party from raising any like or similar issues, claims or defenses in any other or subsequent arbitration, litigation, court hearing or other proceeding involving third parties or other franchisees. No party except 3D BFG, the FRANCHISEE, and their officers, directors, shareholders or partners, and Personal Guarantors will have the right to join in any arbitration proceeding arising under this Agreement, and, therefore, the Arbitrator will not be authorized to permit or approve class actions or to permit any person or entity that is not a party to this Agreement to be involved in or to participate in any arbitration hearings conducted pursuant to this Agreement, 3D BFG and FRANCHISEE agree that arbitration shall be conducted on an individual, not a class-wide, basis and that an arbitration proceeding between 3D BFG and FRANCHISEE shall not be consolidated with any other arbitration proceeding involving 3D BFG its parent, subsidiaries and/or affiliates and any other person, corporation, partnership or limited liability company.

**23.7 <u>DISPUTES NOT SUBJECT TO ARBITRATION.</u>** The disputes and controversies between 3D BFG and the FRANCHISEE which are set forth in Article 24.1 and the following disputes and controversies between 3D BFG and the FRANCHISEE will not be subject to arbitration: (A) any dispute involving the Marks or which arises under or as a result of Article 3 of this Agreement; (B) any dispute involving immediate termination of this Agreement pursuant to Article 9.5 and 9,6 of this Agreement; (C) any dispute involving enforcement of the confidentiality provisions set forth in Article 8 of this Agreement; and (D) any dispute involving enforcement of the covenants not to compete set forth in Article 12 of this Agreement.

**23.8 <u>DE NOVO HEARING ON MERITS.</u>** If the Arbitrator awards either 3D BFG or the FRANCHISEE damages (including actual damages, costs and attorneys' fees) in excess of Fifty Thousand Dollars ($50,000) in any arbitration proceeding commenced pursuant to this Agreement, then the party who has been held liable by the Arbitrator will have the right to a de novo hearing on the merits by commencing an action in a court of competent jurisdiction in accordance with the provisions of this Agreement. If the party held liable by the Arbitrator commences a court action as provided for herein, then neither party will have the right to introduce the Arbitrator's decision or findings in any such court action and the Arbitrator's decision and findings will be of no force and effect and will not be final or binding on either 3D BFG or the FRANCHISEE. If the party who has been held liable by the Arbitrator for over Fifty Thousand Dollars ($50,000) in damages fails to commence a court action within thirty (30) days after the Arbitrator issues his or her award in writing, then the Arbitrator's findings, judgments, decisions and awards will be final and binding on 3D BFG and the FRANCHISEE. Said Court action to be filed in a competent Court within the Miami-Dade County, Fl

**23.9 <u>CONFIDENTIALITY.</u>** All evidence, testimony, records, documents, findings, decisions, judgments and awards pertaining to any arbitration hearing between 3D BFG and the FRANCHISEE will be secret and confidential in all respects. 3D BFG and the FRANCHISEE will not disclose the decision or award of the Arbitrator and will not disclose any evidence, testimony, records, documents, findings, orders, or other matters from the arbitration hearing to any person or entity except as required by law.

**23.10   SEVERABILITY.** It is the desire and intent of the parties to this Agreement that the provisions of this Article be enforced to the fullest extent permissible under the laws and public policy applied in each jurisdiction in which enforcement is sought. Accordingly, if any part of this Article is adjudicated to be invalid or unenforceable, then this Article will be deemed amended to delete that portion thus adjudicated to be invalid or unenforceable to the extent required to make this Article valid and enforceable. Any such deletion will be effective only in the jurisdiction in which the adjudication is made. Further, to the extent any provision of this Article is deemed unenforceable by virtue of its scope, the parties to this Agreement agree that the same will, nevertheless, be enforceable to the fullest extent permissible under the laws and public policies applied in such jurisdiction where enforcement is sought, and the scope in such a case will be determined by arbitration as provided herein.

**ARTICLE 24**

**ENFORCEMENT**

**24.1   INJUNCTIVE RELIEF.** In addition to the provisions of Article 23.7, 3D BFG will have the right to petition a Court of competent jurisdiction for the entry of temporary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement relating to: (A) the FRANCHISEE'S improper or unauthorized use of the Marks and the Business System; (B) the obligations of the FRANCHISEE upon termination or expiration of this Agreement; (C) the transfer or assignment of this Agreement, the franchised Business or substantially all of the assets employed in the franchised Business, or the ownership interests of the FRANCHISEE; (D) the FRANCHISEE'S violation of the provisions of this Agreement relating to confidentiality and covenants not to compete; and (E) any act or omission by the FRANCHISEE or the FRANCHISEE'S employees that, (1) constitutes a violation of any applicable law, ordinance or regulation, (2) is dishonest or misleading to customers of the FRANCHISEE'S Studio 3D Brows' salon Business or other Studio 3D Brows' salon businesses, (3) constitutes a danger to the employees, public or customers of the FRANCHISEE'S Studio 3D Brows' salon Business, or (4) may impair the goodwill associated with the Marks and the Business System. In any action brought under this provision where 3D BFG prevails against the FRANCHISEE, the FRANCHISEE will indemnify 3D BFG for all costs that it incurs in any such proceedings including, without limitation, attorneys' fees actually incurred, expert witness fees, costs of investigation, court costs, travel and living expenses, and all other costs incurred by 3D BFG. Unless provided to the contrary by applicable law, 3D BFG will be entitled to obtain injunctive relief without the posting of any bond or security and the parties agree that 3D BFG may choose to file in a competent Court located in the Miami-Dade county, Fl or in a competent Court where the Franchise is located.

**24.2   SEVERABILITY.** All provisions of this Agreement are severable and this Agreement will be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained herein and partially valid and enforceable provisions will be enforced to the extent valid and enforceable. If any applicable law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder or the taking of some other action not required hereunder, or if under any applicable and binding law of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by 3D BFG is invalid or unenforceable, the prior notice or other action required by such law or rule will be substituted for the notice requirements hereof, or such invalid or unenforceable provision, specification, standard or operating procedure will be modified to the extent required to be valid and enforceable. Such modifications to this Agreement will be effective only in such jurisdiction and will be enforced as originally made and entered into in all other jurisdictions.

**24.3   WAIVER.** 3D BFG and the FRANCHISEE may, by written instrument signed by 3D BFG and the FRANCHISEE, waive any obligation of or restriction upon the other under this Agreement. Acceptance by 3D BFG of any payment by the FRANCHISEE and the failure, refusal or neglect of 3D

41

BFG to exercise any right under this Agreement or to insist upon full compliance by the FRANCHISEE of its obligations hereunder including, without limitation, any mandatory specification, standard or operating procedure, will not constitute a waiver by 3D BFG of any provision of this Agreement. 3D BFG will have the right to waive obligations or restrictions for other franchisees under their Franchise Agreements without waiving those obligations or restrictions for the FRANCHISEE and, except to the extent provided by law, 3D BFG will have the right to negotiate terms and conditions, grant concessions and waive obligations for other franchisees of 3D BFG without granting those same rights to the FRANCHISEE and without incurring any liability to the FRANCHISEE whatsoever.

**24.4     NO RIGHT TO OFFSET.** The FRANCHISEE will not, on grounds of the alleged nonperformance by 3D BFG of any of its obligations under this Agreement, any other contract between 3D BFG and the FRANCHISEE, or for any other reason, withhold payment of any Continuing Fees, Advertising Fees or any other fees or payments due 3D BFG under this Agreement or any other contract, promissory note or other obligation payable by the FRANCHISEE to 3D BFG. The FRANCHISEE will not have the right to "offset" or withhold any liquidated or unliquidated amounts allegedly due to the FRANCHISEE from 3D BFG against the Continuing Fees, the Advertising Fees or any other payments due to 3D BFG under this Agreement or any other contract, promissory note or other obligation payable by the FRANCHISEE to 3D BFG.

**24.5     3D BFG' RIGHTS CUMULATIVE.** The rights of 3D BFG hereunder are cumulative and no exercise or enforcement by 3D BFG of any right or remedy hereunder will preclude the exercise or enforcement by 3D BFG of any other right or remedy hereunder or which 3D BFG is entitled by law to enforce.

**24.6     VENUE AND JURISDICTION.** Unless otherwise required under applicable law, all Arbitration hearings, litigation, court hearings or other hearings initiated by either party against the other party must and will be venued exclusively in Miami-Dade County, Florida. The FRANCHISEE, each of its officers, directors and shareholders, and the Personal Guarantors: (A) acknowledge that Miami-Dade County, Florida is a mutually convenient location for the venue and conduct of any legal or enforcement proceedings; (B) do hereby agree and submit to personal jurisdiction in the State of Florida for the purposes of any arbitration hearings, litigation, court hearings or other hearings brought to enforce or construe the terms of this Agreement or to resolve any dispute or controversy arising under, as a result of, or in connection with this Agreement, the Franchised Location or the FRANCHISEE'S Studio 3D Brows' salon Business; and (C) do hereby agree and stipulate that any arbitration hearings, litigation, court hearings and other hearings will be venued and held exclusively in Miami-Dade County, Florida, and waive any rights to contest such venue and jurisdiction and any claims that such venue and jurisdiction are invalid.

**24.7     AGREEMENT BINDING ON HEIRS AND ASSIGNS.** This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns and successors in interest.

**24.8     JOINT AND SEVERAL LIABILITY.** If the FRANCHISEE consists of more than one person, their liability under this Agreement will be deemed to be joint and several, unless the applicable state law requires otherwise.

**24.9     ENTIRE AGREEMENT.** This FRANCHISE AGREEMENT supersedes and terminates all prior agreements relating to the operation of a Studio 3D Brows' salon Business by the FRANCHISEE at the Franchised Location, either oral or in writing, between the parties and therefore, any representations, inducements, promises or agreements between the parties not contained in this Agreement or not in writing signed by the President or a Vice President of 3D BFG and the FRANCHISEE will not be enforceable. This Agreement will not supersede or terminate any written Development Agreement or Franchise Agreement(s) executed prior to the date of this Agreement relating to other Studio 3D Brows'

42

salon franchises that are or will be owned and operated by the FRANCHISEE. The preambles are a part of this Agreement, which constitutes the entire agreement of the parties, and there are no other oral or written understandings or agreements between 3D BFG and the FRANCHISEE relating to the subject matter of this Agreement.

**24.10   HEADINGS; TERMS**. The headings of the Articles and the provisions thereof are for convenience only and do not define, limit or construe the contents of such Articles. The term "FRANCHISEE" as used herein is applicable to one or more individuals, a corporation or a partnership, as the case may be, and the singular usage includes the plural, and the masculine usage includes the neuter and the feminine, and the neuter usage includes the masculine and the feminine. References to "FRANCHISEE," "assignee" and "transferee" which are applicable to an individual or individuals will mean the principal owner or owners of the equity or operating control of the FRANCHISEE or any such assignee or transferee if the FRANCHISEE or such assignee or transferee is a corporation or partnership. If the FRANCHISEE consists of more than one individual, then all individuals will be bound jointly and severally by the terms and conditions of this Agreement, unless the applicable state law requires otherwise.

**24.11   NO ORAL MODIFICATION.** No modification, change, addition, rescission, release, amendment or waiver of this Agreement and no approval, consent or authorization required by any provision of this Agreement may be made except by a written agreement subscribed to by duly authorized officers or partners of the FRANCHISEE and the President or a Vice President of 3D BFG, 3D BFG and the FRANCHISEE will not have the right to amend or modify this Agreement orally or verbally, and any attempt to do so will be void in all respects.

**24.12   EFFECT OF WRONGFUL TERMINATION**. If either 3D BFG or the FRANCHISEE takes any action to terminate this Agreement or to convert the FRANCHISEE'S Studio 3D Brows' salon Business to another business, and if such action was taken without first complying with the applicable terms and conditions (including the notice and opportunity to cure provisions) of this Agreement, then such action will not relieve either party of, or release either party from, any of its obligations under this Agreement, and the terms and conditions of this Agreement will remain in full force and effect and the parties will be obligated to perform all terms until such time as this Agreement expires or is terminated in accordance with the provisions of this Agreement and applicable law, as determined by an Arbitrator or a Court of competent jurisdiction.

**ARTICLE 25**

**NOTICES AND EMAIL**

**25.1   NOTICES**. All notices to 3D BFG will be in writing and will be made by personal service upon an officer or Director of 3D BFG or sent by prepaid registered or certified United States mail addressed to 3D BFG at **7991 N.W. 21th St., Doral, FL 33122**. All notices to the FRANCHISEE will be by personal service upon the FRANCHISEE, Manager or a salon manager or assistant manager, (or, if applicable, an officer or Director of the FRANCHISEE), or sent by prepaid registered or certified United States mail addressed to the FRANCHISEE at the Franchised Location or such other address as the FRANCHISEE may designate in writing or by delivery to any employee of the FRANCHISEE by a recognized overnight delivery service (such as Federal Express or UPS) which requires a written receipt of delivery from the addressee. Notice by mail is effective upon depositing the same in the mail in the manner provided above, notice by personal service is effective upon obtaining service and notice by overnight delivery service is effective upon delivery by such delivery service.

**25.2   EMAIL.** In addition to using customary means of communications (e.g. telephone, facsimile, U.S. mail), Franchisee shall establish, maintain and use an active email account for routine communications with Franchisor. Franchisee shall provide Franchisor with prompt notice of such active email account and

43

any changes to such email account.

## ARTICLE 26

## ACKNOWLEDGMENTS

**26.1   BUSINESS RISKS; NO FINANCIAL PROJECTIONS.** The FRANCHISEE acknowledges that it has conducted an independent investigation of the Studio 3D Brows' salon Business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business and economic risks and that the financial and business success of the Business will be primarily dependent upon the personal efforts of the FRANCHISEE, its management and employees. 3D BFG expressly disclaims the making of, and the FRANCHISEE acknowledges that it has not received, any estimates, projections, warranties or guaranties, express or implied, regarding potential Gross Revenues, profits, earnings or the financial success of the FRANCHISEE'S Studio 3D Brows' salon Business, except as expressly set forth in writing in 3D BFG' Franchise Disclosure Document, receipt of which is acknowledged by the FRANCHISEE.

**26.2   NO INCOME OR REFUND WARRANTIES.** The FRANCHISEE acknowledges that 3D BFG does not warrant or guarantee to the FRANCHISEE that the FRANCHISEE will derive income or profit from the FRANCHISEE'S Studio 3D Brows' salon Business or that 3D BFG will refund all or part of the Initial Fee or the price paid for the FRANCHISEE'S Studio 3D Brows' salon Business or repurchase any of the products, merchandise, furniture, fixtures, equipment, supplies or chattels supplied by 3D BFG or an approved supplier if the FRANCHISEE is unsatisfied with its Studio 3D Brows' salon Business.

**26.3   TERMS OF OTHER FRANCHISES MAY DIFFER.** The FRANCHISEE acknowledges that other Franchisees of 3D BFG have or will be granted franchises at different times and in different situations, and further acknowledges that the terms and conditions of such franchises and the resulting Franchise Agreements may vary substantially in economics, form and in substance from those contained in this Agreement.

**26.4   RECEIPT OF FRANCHISE DISCLOSURE DOCUMENT.** The FRANCHISEE acknowledges that it received a copy of this Agreement with all material blanks fully completed at least ten (10) business days prior to the date that this Agreement was executed. The FRANCHISEE further acknowledges that it received a Studio 3D Brows Franchise Disclosure Document at least fourteenth (14) business days prior to the date on which this Agreement was executed.

**26.5   COSMETIC CARE BUSINESSES OWNED OR FRANCHISED BY 3D BFG.** The FRANCHISEE agrees and acknowledges that Studio 3D Brows' salon businesses that are now or in the future may be operated and/or franchised by 3D BFG., and/or their affiliate companies or successor corporations in relation to their cosmetic care and product businesses that may address similar markets and thus, may be competitive with existing Studio 3D Brows' salon businesses. Further, the FRANCHISEE acknowledges and agrees that 3D BFG or any of its affiliates will have the absolute right to acquire, merge with, develop, own, manage, license or franchise any cosmetic care or product businesses at any location in the world and over the internet, and the FRANCHISEE hereby waives any and all rights that it may have or allege against 3D BFG or any affiliate, resulting from the opening of any 3D BFG businesses, including those businesses that may be near, adjacent or contiguous to the FRANCHISEE'S Studio 3D Brows' salon Business.

**26.6   OTHER COSMETIC CARE BUSINESSES.** The FRANCHISEE acknowledges and agrees that 3D BFG and any subsidiary or affiliate, will have the absolute right to acquire, merge with, develop, own, manage, license or franchise cosmetic care or product business under any trademark, service mark or trade name at any location or through any channel of distribution anywhere in the

44

world and over the internet, and the FRANCHISEE hereby waives any and all rights that it may have or allege against 3D BFG or any subsidiary or affiliate of any of the foregoing organizations resulting from the opening of any such cosmetic care or product businesses, including those cosmetic care or product businesses that may be near, adjacent or contiguous to the FRANCHISEE'S Studio 3D Brows' salon Business.

## ARTICLE 27

### DISCLAIMER; FRANCHISEE'S LEGAL COUNSEL

**27.1     DISCLAIMER BY 3D BFG.** 3D BFG expressly disclaims the making of any express or implied representations or warranties regarding the sales, earnings, income, profits, Gross Revenues, business or financial success, or value of the FRANCHISEE'S Business, except those expressly set forth in Item 19 of the 3D BFG  Franchise Disclosure Document received by the FRANCHISEE.

**27.2     ACKNOWLEDGMENTS BY FRANCHISEE.** The FRANCHISEE acknowledges that it has not received any express or implied representations or warranties regarding the sales, earnings, income, profits, Gross Revenues, business or financial success, value of the Business or any other matters pertaining to the Studio 3D Brows' salon Business from 3D BFG or any of 3D BFG' officers, employees or agents that were not contained in writing in the   Franchise Disclosure Document (including this Agreement) received by the FRANCHISEE ("representations or warranties"). The FRANCHISEE further acknowledges that if it had received any representations or warranties not contained in 3D BFG' Franchise Disclosure Document, it would not have executed this Agreement, and the FRANCHISEE would have: (A) promptly notified the President of 3D BFG in writing of the person or persons making such representations or warranties; and (B) provided to 3D BFG a specific written statement detailing the representations or warranties made that were not contained in the  Franchise Disclosure Document received by the FRANCHISEE.

**27.3     LEGAL REPRESENTATION.** The FRANCHISEE acknowledges that this Agreement constitutes a legal document which grants certain rights to and imposes certain obligations upon the FRANCHISEE. The FRANCHISEE was advised by 3D BFG to consult an attorney or other advisor prior to the execution of this Agreement to review 3D BFG' Franchise Disclosure Document and this Agreement in detail, to review the economics, operations and other business aspects of the Studio 3D Brows' salon Business, to determine compliance with franchising and other applicable laws, to advise the FRANCHISEE about all federal, state and local laws, rules, ordinances, special regulations and statutes that apply to the FRANCHISEE'S Studio 3D Brows' salon Business and to advise the FRANCHISEE about the economic risks, liabilities, obligations and rights under this Agreement.

## ARTICLE 28

### GOVERNING LAW;  STATE MODIFICATIONS

**28.1     GOVERNING LAW.** Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §1051 et seq.), this Agreement and the relationship between 3D BFG and the FRANCHISEE will be governed by the laws of the state of Florida. The provisions of this Agreement which conflict with or are inconsistent with applicable governing law will be superseded and/or modified by such applicable law only to the extent such provisions are inconsistent. All other provisions of this Agreement will be enforceable as originally made and entered into upon the execution of this Agreement by the FRANCHISEE and 3D BFG.

45

**28.2 STATE MODIFICATIONS.** Some states have statutes which may supersede the provisions of this Agreement in the FRANCHISEE'S relationship with 3D BFG including the areas of termination and renewal of the Franchise. These and other states may have court decisions which may supersede the provisions of this Agreement in the FRANCHISEE'S relationship with 3D BFG including the areas of termination and renewal of the Franchise.

**28.3 SEVERABIL1TY.** The severability provisions of this Agreement contained in Article 12.5, Article 23.10 and Article 24.2 of this Agreement will pertain to all of the applicable laws which conflict with or modify the provisions of this Agreement including, but not limited to, the provisions of this Agreement specifically addressed in Article 28.2 above.

**ARTICLE 29**

**DEFINITIONS**

For purposes of this Agreement, the following words will have the following definitions:

**29.1  ABANDON.**  "Abandon" will mean the conduct of the FRANCHISEE, including acts of omission as well as commission, indicating the willingness, desire or intent of the FRANCHISEE to discontinue operating the franchised Business in accordance with the quality standards, uniform requirements and the Business System set forth in this Agreement and the Manual.

**29.2 DESIGNATED MARKET AREA.** "Designated Market Area" or "DMA" will mean each television market exclusive of another based upon a preponderance of television viewing hours as defined by the ratings service currently being utilized by 3D BFG or its designated advertising agency.

**29.3 BUSINESS SYSTEM.** "Business System" will mean the distinctive services and products which are associated with 3D BFG' trademarks, trade names, service marks, copyrights, interior and exterior building designs, slogans, signs, logos, commercial symbols and color combinations. "Business System" will include all of the uniform requirements, standards of quality and consistency, procedures, specifications, training, advertising and instructions promulgated by 3D BFG.

**29.4 FINANCIAL STATEMENTS.** "Financial statements" will mean a balance sheet, income statement, statement of cash flows and footnotes prepared in accordance with generally accepted accounting principles applied on a consistent basis and any other schedules or forms that may be required by 3D BFG.

**29.5 GROSS REVENUES.** "Gross Revenues" will mean the gross total dollar income of the FRANCHISEE'S Studio 3D Brows' salon Business from all cash, credit or charge sales of all merchandise, products and services sold or rendered in, upon, about or resulting from, in connection with or as a result of the FRANCHISEE'S Studio 3D Brows' salon Business, and will include all sales, receipts and revenues, in any form and from any and all sources whatsoever, including sales of gift certificates and sales made to employees of the FRANCHISEE. This definition will be applicable regardless of whether such sales, receipts or revenues are produced or received by the FRANCHISEE, by any permitted sublicensee, tenant, agent, employee, concessionaire, vending machine, coin-operated machine or vendor of the FRANCHISEE, or by any other business associate of the FRANCHISEE who or which is associated with the FRANCHISEE in order to receive the benefits of the rights granted hereunder to the FRANCHISEE. "Gross Revenues" will include all sales made by the FRANCHISEE whether made for cash or on credit including, but not limited to, those sales charged or made for orders placed or deliveries from the Business franchised hereunder, including orders placed or filled, or services provided at a location other than the Franchised Location, including mail order. "Gross Revenues" will not include any sales, use or gross receipts tax imposed by any federal, state, municipal or governmental authority

46

directly upon sales, if: (A) the amount of the tax is added to the selling price and is expressly charged to the customer; (B) a specific record is made at the time of each sale of the amount of such tax; and (C) the amount thereof is paid over to the appropriate taxing authority by the FRANCHISEE,

**29.6 QUARTERLY.** "Quarterly" or "Quarter" will mean three (3) consecutive calendar months commencing on the first day of the FRANCHISEE'S fiscal or calendar year.

IN WITNESS WHEREOF, 3D BFG, the FRANCHISEE and the shareholders of the FRANCHISEE have respectively signed this Agreement effective as of the day and year first above written.

| FRANCHISOR<br>3D BROWS FRANCHISING GROUP, LLC | FRANCHISEE<br>LADY MOON, LLC |
|---|---|
| By: _____ | By: _____ |
| Its: ___Managing Partner___ | Its: ___Manager___ |

The undersigned individual shareholders/members of the FRANCHISEE hereby agree to be bound by the terms and conditions of this Agreement.

| Shareholders / Members | Percentage of Ownership |
|---|---|
| ___Mariela Ventura_____ | _____51____% |
| ___Carisla M. Ozorio_____ | _____49____% |
| _____ | _____% |
| _____ | _____% |

The undersigned spouse(s) of the individual FRANCHISEE hereby agree to be bound by the terms and conditions of this Agreement regarding confidentiality of information and covenants not to compete.

_____          _____

_____          _____
Print Name                                          Print Name

47

## PERSONAL GUARANTY AND AGREEMENT TO BE BOUND
## PERSONALLY BY THE TERMS AND CONDITIONS
## OF THIS FRANCHISE AGREEMENT

In consideration of the execution of this Agreement by 3D BFG, and for other good and valuable consideration, the undersigned, for themselves, their heirs, successors, and assigns, do jointly, individually and severally hereby become surety and guaranty for the payment of all amounts and the performance of the covenants, terms and conditions in this Agreement, to be paid, kept and performed by the FRANCHISEE.

Further, the undersigned, individually and jointly, hereby agree to be personally bound by each and every condition and term contained in this Agreement and agree that this PERSONAL GUARANTY will be construed as though the undersigned and each of them executed an Agreement containing the identical terms and conditions of this Agreement.

If the FRANCHISEE breaches the terms and conditions of this Agreement, then the undersigned, their heirs, successors and assigns, do hereby, individually, jointly and severally, promise and agree to pay 3D BFG all monies due and payable to 3D BFG under the terms and conditions of this Agreement.

In addition, if the FRANCHISEE fails to comply with any other terms and conditions of this Agreement, then the undersigned, their heirs, successors and assigns, do hereby, individually, jointly and severally, promise and agree to comply with the terms and conditions of this Agreement for and on behalf of the FRANCHISEE.

In addition, should the FRANCHISEE at any time be in default on any obligation to pay monies to 3D BFG or any subsidiary or affiliate of 3D BFG, whether for merchandise, products, supplies, furniture, fixtures, equipment, rent or other goods purchased by the FRANCHISEE from 3D BFG or any subsidiary or affiliate of 3D BFG or for any other indebtedness of the FRANCHISEE to 3D BFG or any subsidiary or affiliate of 3D BFG, then the undersigned, their heirs, successors and assigns, do hereby, individually, jointly and severally, promise and agree to pay all such monies due and payable from the FRANCHISEE to 3D BFG or any subsidiary or affiliate of 3D BFG.

It is further understood and agreed by the undersigned that the provisions, covenants and conditions of this GUARANTY will inure to the benefit of the successors and assigns of 3D BFG. Each of the undersigned hereby submits to personal jurisdiction in the state and federal courts of Florida with respect to any litigation pertaining to this GUARANTY, and agrees that all litigation pertaining to this GUARANTY will and must be venued exclusively in Miami-Dade County, Florida.

**PERSONAL GUARANTORS**

Print Name: _____ Mariela Ventura _____

Address: _____

Signature: _____

Print Name: _____ Carisla M. Ozoria _____

Address: _____

Signature: _____

48

• **EXHIBIT 1**

## CONFIDENTIALITY AGREEMENT

Effective  this  _____day  of  _____,  ____,  in  consideration  of  employment  with _____ (the "Employer"), a franchisee of 3D Brows Franchising Group LLC ("3D BFG"), it is hereby agreed that the undersigned employee (the "Employee") will, at all times during the term of his or her employment and thereafter, treat the Operations Manual and any other materials (including, but not limited to, supplier and vendor lists, customer lists, videotapes, films, drawings, diagrams and computer programs) created for or approved for use in the operation of the Studio 3D Brows' salon Business, and the information contained therein, as secret and confidential and as the sole and absolute property of 3D BFG, and will use all reasonable means to keep them secret and confidential. The Employee will not:

(a) Communicate, divulge or use for the benefit of himself/herself personally or any other person or entity, any information contained in the Operations Manual or other materials deemed confidential by 3D BFG.

(b) Copy, duplicate, videotape, photograph, record, download, scan, maintain cloud access and/or otherwise reproduce the Manual or any other materials, in whole or in part. Neither the Manual nor other materials created for or used in the Studio 3D Brows' salon Business will be borrowed or removed from the Studio 3D Brows' salon location or business premises without the express written approval of the Employer. The Employee will not make any 3D BFG materials available to any unauthorized person or entity, or allow them access to the Manual or other materials.

(c) Use any 3D BFG materials or any information, knowledge, methods or techniques contained or described herein for any purpose other than the performance of his or her duties as a 3D BFG employee. The Employee will respect the confidentiality of the Manual and all other materials as it relates to concurrent and future employment.

The Employee and the Employer acknowledge and agree: (1) that 3D BFG is a third-party beneficiary of the rights and obligations set forth in this Agreement; (2) that 3D BFG will suffer irreparable harm in the event of any breach or violation of this Agreement; (3) that 3D BFG shall have the right to enforce the provisions of this Agreement in its own name in the event of any breach or violation, or threatened breach or violation, of this Agreement; and (4) that 3D BFG shall have the right to obtain specific performance, temporary restraining orders, preliminary injunctions, injunctions and other equitable relief to the extent reasonably necessary to protect its interests in the ownership and confidentiality of the Manual or any other confidential information from any court of competent jurisdiction or Arbitrator, subject to and in accordance with the confidentiality and enforcement provisions of the Franchise Agreement between the Employer and 3D BFG.

The undersigned Employer and Employee understand and accept the obligations set forth herein and agree to be bound by them.

**Dated:** _____, _____

**EMPLOYEE:**

_____

**EMPLOYER:**

_____

**By**_____

49

**EXHIBIT 2**

<u>AUTHORIZATION FOR DIRECT PAYMENT</u>

**3D BROWS FRANCHISING GROUP, LLC**
**2980 NE 207ST STREET, UNIT 116**
**AVENTURA, FL**
(786) 384-1710

AUTHORIZATION FOR DIRECT PAYMENT

      I hereby authorize 3D Brows Franchising Group LLC, to initiate Electronic Funds Transfer (EFT) or Automated Clearing House (ACH) transactions against my checking/savings account as specified below and I instruct the financial institution named below to honor said transactions. This authorization shall remain in force until revocation in writing and will be effective in relation to royalties due under this franchise agreement.

**Name of Financial Institution  :** _____

_____
**Street Address of Financial Institution**

_____ , _____
**City/State/Zip of Financial Institution**        **Telephone**

**Account Number:** _____

**Bank Routing Number (ABA):** _____

## STAPLE VOIDED CHECK HERE:

**Note: Please submit one form per bank account. Make additional copies of this form if necessary**

**Franchisee**             _____

**By:**                   _____

**Date**                _____

EXHIBIT 3

## MINIMUM STAFF TO START OPERATIONS:

**UNLESS OTHERWISE AGREED,  THE FOLLOWING STAFF SHOULD
BE CONTRACTED TO START OPERATIONS.**

| Position | Duties | Minimum | Full |
|----------|--------|---------|------|
| Manager | Management | 1 | 1 |
| Receptionist | Reception and administrative duties | 1 | 1 |
| Cosmetologist | Licensed (specialists) | 2 | 4+ |
| Assistants | Assist cosmetologists and make-up person. Substitution of receptionist if needed. | 1 | 2 |
| Janitor | Cleaning, maintenance | 1 | 1 |
| TOTAL | | 6 | 9 |

51

# EXHIBIT 4

## SELECTED TERMS:

## LOCATION, PROTECTED AREA, AND OPENING DATE

1.     **LOCATION: The Salon shall be located at the following address:**

       **COCOWALK SHOPPING CENTER, Coconut Grove, Fl**

2.     **SALON CONCEPT:  (Small  or Full Size) (__yes /_X_no Turnkey):**

       **Full Size,  no turn key, to be constructed by Franchisee**

3.     **PROTECTED AREA: The Protected Area shall be:**

       **2 miles from: ___ Cocowalk Shopping Center ___**

4.     **OPENING DATE: The Opening Date of the Salon is aprox Feb, 2020.**

5.     **FRANCHISE FEE:  $50,000.00 USD**

6.     **FRANCHISE FEE PAYMENT SCHEDULE:**
       **a.  One payment (less any option price previously paid) with the execution of the Franchise Agreement.**

FRANCHISOR;
**3D Brows Franchising Group LLC**

DATE: ___09-21-2020___

FRANCHISEE;
**LADY MOON, LLC**

DATE: ___09-21-2020___

52

DIGITAL MARKETING  ADDENDUM                    **EXHIBIT 5**

TO FRANCHISE AGREEMENT DATED  AUG 15, 2020,
3D BROWS FRANCHISING GROUP, LLC
AND LADY MOON, LLC (" FRANCHISEE")

**The following supplements <u>Paragraph  7.4</u>  of the standard agreement as to Franchisee's obligations as to advertising through Digital media.**

Digital Media
**Cybernetic or digital Publications, including but not limited to Web pages, blogs, and social media are considered advertising efforts with effect over the brand and as such require the Franchisor's previous approval before being published.**

*Medios Digitales*
*Las publicaciones cibernéticas, incluyendo pero no limitado a paginas de Internet, blogs y redes sociales se consideraran esfuerzos publicitarios con efectos sobre la marca y por ende requieren pre aprobación del Franquiciador antes de ser publicados*

**Before the opening of any of these digital media (either proprietary or through a third party platform) for publishing for your particular franchise location, authorization must be received from Franchisor, who will indicated if such media is allowed, and if it is, instructions will be given as to the manner of implementing said media to warrant the uniformity in the advertising message for the brand and avoiding violations of other third parties or other Franchisees.**

*Antes de abrir uno de estos medios digitales (sea propio o sobre plataforma de tercero) para publicitar su localidad de franquicia, deberá pedir autorización al Franquiciador, quien le indicará si dicho medio está permitido, y si lo está,  les dará guías e instrucciones de como hacerlo de forma tal que se garantice la uniformidad en el mensaje publicitario de la marca y se evite violar los derechos de terceros u otros franquiciatarios.*

**Once the specific media is authorized for use, Franchisee shall seek pre approval for the content to be published and follow any detailed policy established by the Franchisor.**

*Una vez autorizado el abrir cierto medio digital, el Franquiciatario deberá pedir pre aprobación para el contenido a publicar en el mismo y seguir cualquier política detallada entregada por el Franquiciador.*

**The Franchisee may submit for pre approval certain generic or general postings, including photos or text, that will be used in recurrent or repetitive manner. These will not require further approval for being reposted. Notwithstanding, Franchisor reserves the right at any time to request the removal, amendment or substitution of said postings.**

*El franquiciatario podrá someter a pre aprobación, determinadas pautas genéricos o generales, incluyendo artes y fotos, que habrán de usarse en forma recurrente o repetitiva. Estos no requerirán*

*permiso adicional para repetirse. No obstante, el Franquiciador se reserva el derecho a en cualquier momento solicitar se remuevan, enmienden o sustituyan los mismos.*

The Franchisor may at its sole discretion request that any content published be removed, substituted or amended with the purpose of avoiding illegalities, maintain the uniformity of the advertising message and preserve the compatibility with the brand image and Business model.

*El Franquiciador podrá a su sola discreción solicitar en cualquier momento se remueva, sustituya o enmienden cualquier contenido publicado con el fin de evitar ilegalidades, mantener la uniformidad del mensaje publicitario y preservar la compatibilidad con la imagen de la marca y modelo de negocio.*

Franchisor's request for any change, must be performed immediately and within 4 hours, unless there exist reasons beyond Franchisee's control.

*La solicitud del Franquiciador de cualquier cambio deberá realizarse de inmediato y antes de 4 horas a menos q medien razones fuera del control del franquiciatario.*

The Franchisor may request Franchisee to withdraw completely from a specific digital media if at his sole discretion if it finds that being published in said media is detrimental for the brand.

*El Franquiciador podrá requerir al franquiciatario que se retire totalmente de un medio digital en particular si entiende a su sola discreción que estar publicado en el mismo es negativo para la marca.*

The Franchisor may amend this policy from time to time and once notified to Franchisee, it will be enforceable.

*El Franquiciador podrá enmendar esta política en cualquier momento y una vez notificada al franquiciatario, será obligatoria*

FRANCHISOR;                          FRANCHISEE;
3D Brows Franchising Group, LLC      LADY MOON, LLC

DATE: ___ Aug 15, 2020 _____   DATE: ___ Aug 15, 2020 _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

**OSCAR HERRERA,**

      Plaintiff,

vs.

**LADY MOON LLC, d/b/a**
**STUDIO 3D BROWS LASHES**
**& PMU, a Florida limited liability**
**company,**

      Defendant.

_____/

## COMPLAINT

Plaintiff OSCAR HERRERA, through undersigned counsel, sues Defendant LADY MOON LLC, d/b/a STUDIO 3D BROWS LASHES & PMU, a Florida limited liability company, and alleges as follows:

1.     This is an action for declaratory and injunctive relief, attorney's fees, costs, and litigation expenses for unlawful disability discrimination in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§12181-12189 ("ADA"), as amended, and 28 C.F.R. Part 36.

2.     This Court has jurisdiction over this case based on federal question jurisdiction, 28 U.S.C. §1331 and the provisions of the ADA. Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202.

3.     Venue is proper in this Court as all actions complained of herein and injuries and damages suffered occurred in the Southern District of Florida.

1

Case 1:24-cv-25065-KMW   Document 1   Entered on FLSD Docket 12/23/2024   Page 2 of 20

4.      Plaintiff OSCAR HERRERA is a resident of Miami-Dade County, Florida, is *sui juris*, and is disabled as defined by the ADA and ADA Amendments Act of 2008, 42 U.S.C. §12101 ("ADAAA").

5.      Plaintiff is and at all relevant times has been a blind and visually disabled person who has been medically diagnosed with "complete blindness" as a result of trauma to both eyes. Because of his condition, Plaintiff is blind and thus is substantially limited in performing one or more major life activities, including, but not limited to, seeing, accurately visualizing his world, and adequately traversing obstacles. As such, he is a member of a protected class under the ADA, 42 U.S.C. §12102(1)-(2), the regulations implementing the ADA set forth at 28 CFR §§36.101, *et seq.*, and 42 U.S.C. §3602(h). Plaintiff further is an advocate of the rights of similarly situated disabled persons and is a "tester" for the purposes of asserting his civil rights and monitoring, ensuring, and determining whether places of public accommodation and/or their respective and associated websites are in compliance with the ADA and any other applicable disability laws, regulations, and ordinances.

6.      Because he is blind, Plaintiff cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. "The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay

this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017).

7.      Defendant is a Florida limited liability company authorized to do business and doing business in the State of Florida. Defendant owns, operates, and/or controls, either directly or through franchise agreements, three U.S.-based beauty shops selling beauty services, one or more of which Plaintiff intended to patronize in the near future, including the beauty studio located in Cocowalk at 3015 Grand Avenue, Coconut Grove, Florida.

8.      Plaintiff's blindness limits him in the performance of major life activities, including seeing, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

9.      Plaintiff frequently accesses the internet. Because he is blind, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, Plaintiff uses commercially available screen reader software to interface with the various websites.

10.     At all times material hereto, Defendant was and still is an organization that owns, operates, and/or controls, either directly or through franchise agreements, three U.S.-based beauty shops under the name "Studio 3D Brows Lashes & PMU". Each "Studio 3D Brows Lashes & PMU" beauty shop is open to the public. As the owner, operator, and/or controller of these beauty shops, Defendant is defined as a place of "public accommodation" within meaning of the ADA because Defendant is a private entity which owns, operates, and/or controls, "a laundromat, dry-

cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment," per 42 U.S.C. §12181(7)(F) and 28 C.F.R. §36.104(6).

11.    Because Defendant is a beauty shop open to the public, each of Defendant's physical beauty shops is a place of public accommodation subject to the requirements of the ADA, 42 U.S.C. §12182, §12181(7)(F), and its implementing regulations, 28 C.F.R. Part 36.

12.    Defendant also owns, controls, maintains, and/or operates an adjunct website, https://studio3dbrows.com/fl/home (the "Website"). One of the functions of the Website is to provide the public information on the locations of Defendant's physical beauty shops. Defendant also offers for booking and sells to the public its beauty services that are carried out at the physical beauty shops through the Website, which acts as a critical point of booking and sale for Defendant's beauty services that are also available for booking and purchase in, from, and through Defendant's physical beauty shops. In addition, Defendant's Website allows users to purchase membership packages for participating beauty shop locations and purchase electronic gift certificates for use online and in Defendant's physical beauty shops.

13.    The Website also services Defendant's physical beauty shops by providing information on available services, tips and advice, editorials, sales campaigns, events, and other information that Defendant is interested in communicating to its customers.

14.    Because the Website allows the public the ability to secure information about the locations of Defendant's physical beauty shops, book and purchase beauty services carried out at the physical beauty shops that are also available for booking and purchase in, from, and through the physical beauty shops, purchase membership packages for participating beauty shop locations,

and purchase electronic gift certificates for use online and in Defendant's physical beauty shops, the Website has a nexus to, and is an extension of and gateway to, the goods, services, privileges, and advantages of Defendant's physical beauty shops, which are places of public accommodation under the ADA. As an extension of and service, privilege, and advantage provided by a place of public accommodation as defined under the ADA, the Website is an extension of the services, privileges, and advantages made available to the general public by Defendant at and through its brick-and-mortar locations and businesses.

15. Because the public can view, book, and purchase Defendant's beauty services that are carried out at the physical beauty shops through the Website that are also offered for booking and sale in, from, and through Defendant's physical beauty shops, thus having the Website act as a critical point of booking and sale for Defendant's beauty services that are also sold in, from, and through the physical beauty shops, secure information about the locations of Defendant's physical beauty shops, purchase membership packages for participating beauty shop locations, and purchase electronic gift certificates for use online and in Defendant's physical beauty shops, the Website is an extension of, and gateway to the physical beauty shops, which are places of public accommodation pursuant to the ADA, 42 U.S.C. §12181(7)(F). As such, the Website is a necessary service, privilege, and advantage of Defendant's brick-and-mortar beauty shops that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages afforded the non-visually disabled public both online and in the physical beauty shops.

16. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling the Website. Since the Website is open to the public through the

internet, by this nexus the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar beauty shops that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical beauty shops. As such, Defendant has subjected itself and the Website to the requirements of the ADA.

17.    Plaintiff is and/or has been a customer who is interested in patronizing, and intends to patronize in the near future once the Website's access barriers are removed or remedied, one or more of Defendant's physical beauty shops (including the beauty shop located in Coconut Grove, Florida), and to search for the brick-and-mortar beauty shops, check beauty shop hours and services pricing, book and purchase beauty services carried out at the physical beauty shops, purchase membership packages for participating beauty shop locations, and purchase electronic gift certificates for use online and in Defendant's physical beauty shops. In the alternative, Plaintiff intends to monitor the Website in the near future, as a tester, to ascertain whether it has been remedied and updated to interact properly with screen reader software.

18.    The opportunity to shop and pre-shop Defendant's beauty services, secure information about the locations of Defendant's physical beauty shops, book and purchase appointments for services carried out at the physical beauty shops, purchase membership packages for participating beauty shop locations, and purchase electronic gift certificates for use online and in Defendant's physical beauty shops from his home are important and necessary accommodations for Plaintiff because traveling outside of his home as a blind individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its

business information in any other digital format that is accessible for use by blind and visually disabled individuals using screen reader software.

19. Like many consumers, Plaintiff accesses several websites at a time to help plan his service establishment visits and to compare services, prices, sales, discounts, and promotions. Plaintiff may look at several dozen websites to compare features, discounts, services, promotions, and prices.

20. Beginning in October 2024, Plaintiff attempted on a number of occasions to utilize the Website to browse through the available beauty services and online offers to educate himself as to the services, sales, discounts, and promotions being offered, learn about the brick-and-mortar beauty shops, check beauty shop hours, and check beauty services pricing with the intent to book an appointment and make a purchase through the Website or in, from, and through one or more of the physical beauty shops (including the physical beauty shop located in Coconut Grove, Florida). Plaintiff, also attempted to access and utilize the Website in his capacity as a tester to determine whether it was accessible to blind and visually disabled persons, such as himself, who use screen reader software to access and navigate company websites.

21. Plaintiff utilizes available screen reader software that allows individuals who are blind and visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by blind and visually disabled individuals using keyboards and available screen reader software. These access barriers, one or more of which were experienced by Plaintiff, are pervasive and, as confirmed by Plaintiff's expert, include the following (with reference to the Web Content Accessibility Guidelines ("WCAG") 2.1 Level A and AA):

a)      Level A Guideline 1.2.1 – Audio-only and Video-only (Pre-recorded) (Alternatives to video-only and audio-only content are provided) – The lack of alternatives to the video-only content on the "Videos" webpage. There are 30 videos, including demonstration and tutorial videos, that do not include speech or narration. For example, in the "3D Lips" video, instructions are provided by actors demonstrating the processes as well as through the use of on-screen text, none of which is announced or available to the screen reader user in an accessible format (e.g., a transcript, audio description, etc.).

b)      Level A Guideline 1.3.1 – Info and Relationships (Information, structure, and relationships conveyed through presentation can be programmatically determined or are also available in text) – Although differentiated visually, original and sale prices that are announced as though they are the same. For example, on the "3D Brows" service webpage, sighted users can see that original prices for services are crossed out while the sale prices are bolded. However, as arrow key navigation moves focus over the total value price of a service (which shows both the original and sale price), the screen reader announces, "Deleted (original price value) US dollars (sale price value) US dollars" instead of clear and understandable labels, such as "original price (original price value) dollars" and "sale price (sale price value) dollars". The announcement of the word "deleted" before both prices does not clearly establish the difference between the two. As a result, the screen reader user cannot know the significance of the prices.

c)      Level A Guideline 1.3.1 - Info and Relationships (2) (Information, structure, and relationships conveyed through presentation can be programmatically determined or are also available in text) – The lack of verbal notification when an appointment date is successfully selected on the appointment booking webpage. Sighted users can see that the selection was successful as a gray circle appears around the selected date as well as a few days that follow it.

However, nothing is announced for non-sighted users, such as the screen reader user. Additionally, after successfully selecting a date, tab focus automatically returns to the current date, thus forcing the user to tab back through the remaining visible dates on the calendar, including the date they just selected (which is not verbally identified as selected), before reaching the "Search" button.

d)   Leve A Guideline 2.1.1 – Keyboard (website must be accessible by keyboard only (no mouse or other pointing device)) – An inaccessible submenu for the "Services" link. The screen reader software does announce this link as "services collapsed submenu link", so the screen reader user is aware of the existence of the submenu; however, pressing enter on the collapsed link immediately opens the "Services" webpage. As a result, the submenu cannot at any point be accessed by the screen reader user.

e)   Level A Guideline 2.1.1 - Keyboard (2) (website must be accessible by keyboard only (no mouse or other pointing device)) – An inaccessible date picker on the membership checkout page. Tab focus moves from the "When would you like to start?" date field immediately to the "Make Purchase" button, thus skipping over the clickable calendar icon in the process; when this icon is clicked with a mouse, however, a date picker appears for date selection.

f)   Level A Guideline 2.4.3 – Focus Order (website provides focus in a logical order that preserves meaning and operability) – An unannounced and unfocused upon "login" pop-up that appears after the "Checkout" button is selected on the membership checkout page; tabbing continues focus through the remainder of the webpage behind the pop-up and then back to the toolbar.

g)   Level A Guideline 2.4.4 – Link Purpose (In Context) (Link purpose is clear from its context) – Graphic links on the "Services" webpage that are not given meaningful labels, which prevents the screen reader user from knowing their purpose/destination. Only three labels

9

associated with the links are announced after the (mislabeled) graphic link; all other graphic links are announced as "studio3dbrows.com page_id=(numbers) visited link".

22.    Plaintiff attempted to locate an "accessibility" notice, statement, or policy on the Website that would direct him to a webpage with contact information for disabled individuals who have questions or concerns about, or who are having difficulties accessing, navigating, and communicating with, the Website. However, Plaintiff was unable to do so because no such link or notice, statement, or policy existed on the Website.

23.    The fact that Plaintiff could not communicate with or within the Website left him feeling excluded, frustrated, and humiliated, and gave him a sense of isolation and segregation, as he is unable to participate in the same service experience, with the same access to the services, sales, discounts, and promotions, as provided at the Website and in the physical beauty shops as the non-visually disabled public.

24.    Plaintiff desires and intends in the near future once the Website's access barriers are removed or remedied to patronize one or more of Defendant's physical beauty shops (including the physical beauty shop located in Coconut Grove) and to use the Website, but he is presently unable to do so as he is unable to effectively communicate with Defendant due to his blindness and the Website's access barriers. Alternatively, as a tester using screen reader software, Plaintiff is unable to fully and equally access, navigate, and communicate with Defendant through the Website due to his blindness and the Website's access barriers. Thus, Plaintiff and others who are blind and with visual disabilities will suffer continuous and ongoing harm from Defendant's intentional acts, omissions, policies, and practices as set forth herein unless properly enjoined by this Court.

25. Because of the nexus between Defendant's physical beauty shops and the Website, and the fact that the Website clearly provides support for and is connected to Defendant's physical beauty shops for its operation and use, the Website is an intangible service, privilege, and advantage of Defendant's brick-and-mortar beauty shops that must comply with all requirements of the ADA, must not discriminate against individuals with disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as afforded the non-visually disabled public both online and in the physical beauty shops, which are places of public accommodation subject to the requirements of the ADA.

26. On information and belief, Defendant has not initiated a Web Accessibility Policy to ensure full and equal use of the Website by individuals with disabilities.

27. On information and belief, Defendant has not instituted a Web Accessibility Committee to ensure full and equal use of the Website by individuals with disabilities.

28. On information and belief, Defendant has not designated an employee as a Web Accessibility Coordinator to ensure full and equal use of the Website by individuals with disabilities.

29. On information and belief, Defendant has not instituted a Web Accessibility User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

30. On information and belief, Defendant has not instituted a User Accessibility Testing Group to ensure full and equal use of the Website by individuals with disabilities.

31. On information and belief, Defendant has not instituted a Bug Fix Priority Policy.

32. On information and belief, Defendant has not instituted an Automated Web Accessibility Testing program.

11

33.     Defendant has not created and instituted a useful and effective Specialized Customer Assistance line, service, or email contact mode for customer assistance for the visually disabled.

34.     Defendant has not created and instituted on the Website a useful and effective page for individuals with disabilities, nor displayed a proper link and information hotline, nor created a proper information portal explaining when and how Defendant will have the Website, applications, and digital assets accessible to the visually disabled and/or blind communities.

35.     The Website does not meet the Web Content Accessibility Guidelines ("WCAG") 2.0 Level AA or higher versions of web accessibility.

36.     Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals who want the safety and privacy of booking and purchasing Defendant's beauty services offered on the Website and in the physical beauty shops from their homes.

37.     Defendant thus has not provided full and equal access to, and enjoyment of, the goods, services, facilities, privileges, advantages, and accommodations provided by and through the Website and the physical beauty shops in contravention of the ADA.

38.     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities, such as Plaintiff.

39.     The broad mandate of the ADA is to provide an equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites, such as the Website at issue in the instant action.

40. Defendant is, and at all relevant times has been, aware of the barriers to effective communication within the Website, which prevent individuals with visual disabilities from the means to comprehend information presented therein.

41. Defendant is, and at all relevant times has been, aware of the need to provide full and equal access to all visitors to the Website.

42. The barriers that exist on the Website result in discriminatory and unequal treatment of individuals with visual disabilities, including Plaintiff.

43. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged hereinabove, and this suit for declaratory judgment and injunctive relief is his only means to secure adequate and complete redress from Defendant's unlawful and discriminatory practices in connection with the Website's access and operation.

44. Notice to Defendant is not required because of Defendant's failure to cure the violations.

45. Enforcement of Plaintiff's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

46. Plaintiff has retained the undersigned attorneys to represent him in this case and has agreed to pay them a reasonable fee for their services.

## COUNT I – VIOLATION OF THE ADA

47. Plaintiff re-alleges paragraphs 1 through 46 as if set forth fully herein.

48. Pursuant to 42 U.S.C. §12181(7)(F), Defendant is a public accommodation under the ADA and thus is subject to the ADA.

49. Pursuant to 42 U.S.C. §12181(7)(F), the Website is covered under the ADA because it provides the general public with the ability to locate and learn about Defendant's

physical beauty shops, book and purchase beauty services carried out at the physical beauty shops that are also available for booking and purchase in, from, and through the physical beauty shops, purchase membership packages for participating beauty shop locations, and purchase electronic gift certificates for use online and in Defendant's physical beauty shops. The Website thus is an extension of, gateway to, and intangible service, privilege, and advantage of Defendant's physical beauty shops. Further, the Website serves to augment Defendant's physical beauty shops by providing the public information about the beauty shops and by educating the public as to Defendant's available beauty services offered for booking and sale through the Website and in, from, and through the physical beauty shops.

50.     Under Title III of the ADA, 42 U.S.C. §12182(b)(1)(A)(II), it is unlawful discrimination to deny individuals with disabilities or a class of individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals.

51.     Specifically, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(II), unlawful discrimination includes, among other things, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations."

52.     In addition, under Title III of the ADA, 42 U.S.C. §12182(b)(2)(A)(III), unlawful discrimination includes, among other things, "a failure to take such steps, as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services,

unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden."

53.     Defendant's Website must comply with the ADA, but it does not as specifically alleged hereinabove and below.

54.     Because of the inaccessibility of the Website, individuals with visual disabilities are denied full and equal access to and enjoyment of the goods, information, and services that Defendant has made available to the public on the Website and in the physical beauty shops in violation of 42 U.S.C. §12101, *et seq*, and as prohibited by 42 U.S.C. §12182, *et seq*.

55.     The Website was subsequently visited by Plaintiffs expert in November 2024, and the expert determined that many of the same access barriers that Plaintiff had initially encountered, as well as numerous additional access barriers, existed. Defendant thus has made insufficient material changes or improvements to the Website to enable its full and equal use, and enjoyment by, and accessibility to, blind and visually disabled persons, such as Plaintiff. Defendant has not disclosed to the public any intended audits, changes, or lawsuits to correct the inaccessibility of the Website to visually disabled individuals, nor has it posted on the Website a useful and effective "accessibility" notice, statement, or policy to provide blind and visually disabled persons, such as Plaintiff, with a viable alternative means to fully and equally access and navigate the Website. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

56.     More violations may be present on other pages of the Website, which can and will be determined and proven through the discovery process in this case.

57.    Further, the Website does not offer or include the universal symbol for the disabled that would permit disabled individuals to access the Website's accessibility information and accessibility facts.

58.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Examples of such guidelines include, but are not limited to, adding alt-text to graphics and ensuring that all functions can be performed using a keyboard.  Incorporating such basic components to make the Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to Defendant.

59.    Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to the Website by individuals, such as Plaintiff, with visual disabilities who require the assistance of screen reader software to comprehend and access internet websites.  These violations within the Website are ongoing.

60.    The ADA requires that public accommodations and places of public accommodation ensure that communication is effective.

61.    According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

62.    According to 28 C.F.R. §36.303(c), public accommodations must furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities: "In order to be effective, auxiliary aids and services must be provided

in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability," 28 C.F.R. §36.303(c)(1)(ii).

63.     Part 36 of Title 28 of the C.F.R. was designed and is implemented to effectuate subtitle A of Title III of the ADA, which prohibits discrimination on the basis of disability by public accommodations, and requires places of public accommodation to be designed, constructed, and altered in compliance with the accessibility standards established by Part 36.

64.     As alleged hereinabove, the Website has not been designed to interface with the widely and readily available technologies that can be used to ensure effective communication and thus violates the ADA.

65.     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its brick-and-mortar locations, Plaintiff has suffered an injury in fact by being denied full and equal access to, enjoyment of, and communication with Defendant's Website and its physical beauty shops.

66.     Because of the inadequate development and administration of the Website, Plaintiff is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

67.     Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff appropriate and necessary injunctive relief, including an order to:

a) Require Defendant to adopt and implement a web accessibility policy to make publicly available, and directly link from the homepage of the Website, a functional statement of the policy to ensure persons with disabilities have full and equal access to and enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the physical beauty shops through the Website.

b) Require Defendant to take the necessary steps to make the Website readily accessible to and usable by blind and visually disabled users, and during that time period prior to the Website being made readily accessible, provide an alternative method for individuals with visual disabilities to access the information available on the Website until such time that the requisite modifications are made, and

c) Require Defendant to provide the appropriate auxiliary aids such that individuals with visual disabilities will be able to effectively communicate with the Website for purposes of viewing and locating Defendant's physical beauty shops and becoming informed of, booking, and purchasing Defendant's beauty services that are carried out at the physical beauty shops, and during that time period prior to the Website being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through the Website and the physical beauty shops.

68.     Plaintiff is entitled to recover his reasonable attorney's fees, costs, and expenses pursuant to the ADA. To that end, Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action and has agreed to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff requests entry of judgment in his favor and against Defendant for the following relief:

A.  A declaration that Defendant's Website is in violation of the ADA;

B.  An Order requiring Defendant, by a date certain, to update the Website, and continue to monitor and update the Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, the Website and

effectively communicate with the Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within the Website, wherein the logo[1] would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of the Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a Website accessibility coordinator, a Website application accessibility policy, and providing for Website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to its Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for the Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop

---

[1]  or similar.

programs or code for, or who publish final content to, the Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.  An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of the Website to identify any instances where the Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.  An Order directing Defendant, by a date certain, to make publicly available and directly link from the Website homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of the Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.  An award to Plaintiff of his reasonable attorney's fees, costs and expenses; and

L.  Such other and further relief as the Court deems just and equitable.

DATED:  December 23, 2024.

**RODERICK V. HANNAH, ESQ., P.A.**
Counsel for Plaintiff
4800 N. Hiatus Road
Sunrise, FL 33351
T. 954/362-3800
954/362-3779 (Facsimile)
Email: rhannah@rhannahlaw.com

By:  *s/ Roderick V. Hannah*
  RODERICK V. HANNAH
  Fla. Bar No. 435384

**LAW OFFICE OF PELAYO DURAN, P.A.**
Co-Counsel for Plaintiff
6355 N.W. 36th Street, Suite 307
Virginia Gardens, FL 33166
T. 305/266-9780
305/269-8311 (Facsimile)
Email: duranandassociates@gmail.com

By:  *s/ Pelayo M. Duran*
  PELAYO M. DURAN
  Fla. Bar No. 0146595

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

OSCAR HERRERA

**DEFENDANTS**

LADY MOON LLC d/b/a STUDIO 3D BROWS LASHES

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
RODERICK V. HANNAH, ESQ.        (954) 362-3800
4800 NORTH HIATUS ROAD, SUNRISE FL 33351-7919

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☒ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title III of the Americans with Disabilities Act, 42 USC Sections 12181 through 12189, as amended, and 28 CFR Part 36
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
DECEMBER 23, 2024

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| OSCAR HERRERA <br><br> *Plaintiff(s)* <br><br> v. <br><br> LADY MOON LLC d/b/a STUDIO 3D BROWS LASHES & PMU, a Florida limited liability company <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* LADY MOON LLC d/b/a STUDIO 3D BROWS LASHES & PMU
By Serving Its Registered Agent:
MARIELA VENTURA
3015 GRAND AVENUE
SUITE 210
COCONUT GROVE FL  33133

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: RODERICK V. HANNAH, ESQ.
4800 NORTH HIATUS ROAD
SUNRISE FL  33351-7919
Telephone:  (954) 362-3800·

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

  ☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

  ☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

  ☐ I served the summons on *(name of individual)* _____ , who is

  designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

  ☐ I returned the summons unexecuted because _____ ; or

  ☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc: